# United States Court of Appeals
## For the First Circuit

No. 05-1430

ASOCIACIÓN DE SUBSCRIPCIÓN CONJUNTA
DEL SEGURO DE RESPONSABILIDAD OBLIGATORIO,

Plaintiff, Appellee,

v.

JUAN A. FLORES GALARZA, in his personal and official capacity as
the Secretary of the Treasury of the Commonwealth of Puerto Rico;
and ANNABELLE RODRÍGUEZ, Secretary of Justice of the Commonwealth
of Puerto Rico,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Dominguez, U.S. District Judge]

Before

Lipez, Circuit Judge,
Gibson,* Senior Circuit Judge,
Howard, Circuit Judge.

Eduardo do Vera Ramírez, with whom Julio César Alejandro
Serrano and Landrón & Vera, LLP were on brief, for appellants.
Veronica Ferraiuoli-Hornedo, with whom Rubén T. Nigaglioni,
Rafael J. Martínez, and Nigaglioni & Ferraiuoli Law Offices, PSC
were on brief, for appellee.

March 1, 2007

---

* Of the Eighth Circuit, sitting by designation.

**LIPEZ**, **Circuit Judge**.  The Compulsory Liability Joint Underwriting Association of Puerto Rico ("JUA"), a Commonwealth-created entity, filed a lawsuit against Juan A. Flores Galarza ("Flores Galarza" or "Secretary"), then the Secretary of the Treasury of the Commonwealth, in both his official and personal capacities,[1] claiming that he violated the Takings Clause of the United States Constitution by withholding from the JUA and appropriating insurance premiums generated by Puerto Rico's compulsory liability insurance law to alleviate the cash-flow problems of the Commonwealth.  Flores Galarza moved for judgment on the pleadings, claiming that the forms of relief sought by the plaintiff (declaratory, injunctive, and damages) were barred by the Eleventh Amendment and the doctrine of qualified immunity.  The

---

[1] During the pendency of this case, Juan Carlos Méndez replaced Flores Galarza as Secretary of the Treasury.  As a matter of law, Méndez was automatically substituted as a party for Flores Galarza in his official capacity as Secretary.  See Fed. R. Civ. P. 25(d)(1) ("When a public officer is a party to an action in his official capacity and during its pendency dies, resigns, or otherwise ceases to hold office, the action does not abate and the officer's successor is automatically substituted as a party.").  Flores Galarza remains a party in his personal capacity.  See, e.g., Batistini v. Aquino, 890 F.2d 535, 536 n.1 (1989).  While the parties' briefs do not acknowledge this substitution, these misnomers do not affect the substantial rights of the parties and, therefore, we disregard them.  See Fed. R. Civ. P. 25(d)(1) ("[M]isnomer[s] not affecting the substantial rights of the parties shall be disregarded.").  For the sake of consistency with the parties' briefs, we use the name of the former Secretary of the Treasury, Flores Galarza, when referring to the official-capacity suit against the Secretary.

district court denied that motion.  We have before us an interlocutory appeal from that denial.

Among other complexities, this case tests the sometimes uncertain boundary between official- and personal-capacity claims against a government official, and the applicability of the qualified immunity doctrine to an unusual takings claim.  For the reasons set forth below, after concluding that the JUA has standing to sue Flores Galarza, we conclude that, consistent with the Eleventh Amendment, Flores Galarza is amenable to suit in his official capacity for injunctive and declaratory relief, but is protected from damages in his personal capacity by the doctrine of qualified immunity.

**I.**

**A.  Law 253:  The Compulsory Liability Insurance System**

The following facts are drawn from the complaint and, where noted, from relevant statutory and case law.  On December 27, 1995, in response to financial losses from uncompensated damages to motor vehicles in traffic accidents, the Commonwealth of Puerto Rico ("Commonwealth") enacted the Compulsory Motor Vehicle Liability Insurance Act, Act No. 253 ("Law 253"), codified at P.R. Laws Ann. tit. 26, §§ 8051-61.  Under Law 253, liability insurance coverage is required for all motor vehicles that travel on public thoroughfares.  Law 253 "provides each insured vehicle owner with $3000 of coverage for damages caused to third parties per accident

in exchange for a uniform premium, initially set at $99 for each private passenger vehicle and $148 for each commercial vehicle." Arroyo-Melecio v. P.R. Am. Ins. Co., 398 F.3d 56, 60-61 (1st Cir. 2005) (citing P.R. Laws Ann. tit. 26, §§ 8052(j), 8056(a)).

All "private insurers" – defined under Law 253 as those with more than 1% of the total volume of vehicle liability premiums in Puerto Rico, P.R. Laws Ann. tit. 26, § 8052(b) – are required to provide compulsory liability insurance in one of two ways. First, private insurers are "bound to provide the compulsory liability insurance to those motor vehicle owners that request it," id. § 8054(a), unless those owners meet certain statutory criteria, most of which "identify applicants who are bad drivers or otherwise of high risk," Arroyo-Melecio, 398 F.3d at 61. Second, private insurers are required to provide compulsory liability insurance as members of the JUA, to which they must belong. The JUA is an association of all private insurers in Puerto Rico, which "provides compulsory liability insurance to all drivers, including those high-risk drivers whom private insurers are not required to insure." Id. (footnote omitted). "Through the JUA, the risk of insuring these high-risk drivers is thus spread among all the private insurers." Id. at 62.

Every vehicle owner must either: (1) pay the premium for compulsory liability insurance to the Secretary of the Treasury at the time that the owner acquires or renews a vehicle license,

-4-

effectively as part of the license payment; or (2) opt out of the compulsory liability insurance scheme by privately purchasing liability insurance with comparable or better coverage. Id. at 61 n.2 (citing P.R. Laws Ann. tit. 26, § 8061).[2] In the case of those vehicle owners who pay the Secretary for compulsory liability insurance, "[t]he [JUA] shall receive from the Secretary of the Treasury the total amount of the compulsory liability insurance premiums received by said official, for its eventual distribution among the private insurers and the [JUA] itself, as the case may be." P.R. Laws Ann. tit. 26, § 8055(c). The JUA's administrative and operating expenses are "charged to the amount received from the corresponding premiums according to this distribution." Id.

If a vehicle owner does not present a Certificate of Compliance proving that he carries traditional liability insurance, he must pay the compulsory liability insurance premium on the date

---

[2] Section 8061(a) states that motor vehicle owners with sufficient "traditional" liability insurance may rely on that coverage to comply with Law 253. "Traditional liability insurance" is defined by Law 253 as standard vehicle insurance, which in turn is defined in P.R. Laws Ann. tit. 26, § 407(1) as, inter alia, insurance protecting against both personal and property damage "resulting from or incident to ownership, maintenance, or use of any . . . vehicle."

According to the JUA's website, individuals who have the requisite amount of traditional liability insurance may obtain a Certificate of Compliance from their insurer to present when they obtain or renew licenses, and may thereby avoid paying the compulsory insurance premium to the Secretary. See P.R. Laws Ann. tit. 26, § 8061(b) (empowering the Insurance Commissioner to establish regulations "so that motor vehicle owners who comply with the insurance requirements of subsection (a) of this section may present attesting proof of . . . compliance").

-5-

of issuance or renewal of the vehicle license, and may then seek reimbursement directly from the JUA or from his insurer, who will, in turn, seek reimbursement from the JUA.[3]   Thus, the funds transferred from the Secretary to the JUA appear to consist of: (1) premium payments from individuals seeking to purchase insurance through the JUA who paid the Secretary, as required by the statute, when they obtained or renewed their vehicle licenses, (2) duplicate premium payments from individuals who are purchasing the compulsory insurance directly from a private insurer, but who paid the compulsory assessment to the Secretary along with their license fees (and who thus are eligible for a refund from the JUA), and (3) duplicate premium payments from individuals who have adequate traditional liability coverage, but who did not obtain the Certificate of Compliance that would have exempted them from the compulsory assessment (who also are eligible for a refund).   The JUA is responsible for distributing the premiums it receives from the Secretary to its member insurers for the coverage they provide. Arroyo-Melecio, 398 F.3d at 61 n.2.[4]

---

[3] The statute does not indicate whether individuals who privately purchase only the compulsory coverage – and not the more comprehensive traditional liability coverage – may avoid the premium payment to the Secretary by presenting proof of coverage. For purposes of this appeal, we assume that they may not, and that, consequently, this group of vehicle owners must seek later reimbursement of their duplicate payments.

[4] Although the JUA's member insurers provide the compulsory coverage, "every vehicle for which the requisite compulsory

The JUA is required to file an annual statement with the Insurance Commissioner detailing its financial condition, transactions, and affairs for the preceding calendar year. Because a portion of the total amount of premiums received by the JUA may be owed to third parties who seek refunds for duplicate payments – i.e., vehicle owners who bought insurance from a private insurer but also paid the compulsory liability premium when obtaining licenses, or private insurers who have reimbursed their insureds for payment of the compulsory premium – the JUA is required by regulation to set aside these premiums and accumulate them in a separate reserve account ("Reserve").[5]

---

liability insurance premium has been paid is considered to be insured by the JUA unless the owner of the vehicle opts out by selecting a private insurer or purchasing a traditional insurance policy." Arroyo-Melecio, 398 F.3d at 61 n.2.

[5] Pursuant to the general provisions of Puerto Rico's Insurance Code, P.R. Laws Ann. tit. 26, §§ 2603-2607, the JUA's obligation to reimburse these so-called "unearned premiums" lasts seven years, after which time the premiums lapse to the Insurance Commissioner and are then deposited in the general fund of the Commonwealth Treasury. Although the JUA did not reference this general provision in either its brief before us or at oral argument, Puerto Rico's Insurance Code makes clear that this general provision applies to the compulsory liability insurance system under Law 253. See id. § 2612 ("The [general provision governing unclaimed funds] shall prevail over the provisions of any other chapter present or future which may be in conflict herewith."). Flores Galarza invokes this statutory provision in his brief.

-7-

**B.  The Secretary's Withholding of Funds**

Since the effective date of the compulsory liability insurance system on January 1, 1998,[6] the JUA has been unable to determine exactly how many registered motor vehicles in Puerto Rico are covered by private liability insurance.  The JUA initially estimated that 25% of all vehicles were covered by policies from private insurers, and, accordingly, set aside 25% of all premiums received and accumulated them in the Reserve.  By 2001, experience and additional data revealed that the actual proportion of privately insured registered motor vehicles was closer to 17%.  As a result, the Reserve as disclosed in the December 2001 annual statement – approximately $73 million – exceeded the actual amount owed to third parties by approximately $10 million ("Overstated Reserve Funds").  In other words, the JUA set aside and accumulated in the Reserve approximately $10 million more than was actually owed to privately insured vehicle owners and their insurers who would be seeking reimbursement for the purchase of duplicative compulsory liability insurance.  In 2001, the JUA sought permission from the Insurance Commissioner to adjust the Reserve to the accumulated level that it would have been if only 17% of all

---

[6] While Law 253 was enacted in 1995, the compulsory liability insurance system established under Law 253 did not take effect until January 1, 1998.  1995 P.R. Laws 253, § 16.

premiums had been set aside, rather than 25%. The Insurance Commissioner agreed to allow the JUA to adjust the Reserve for the 2001 fiscal year, but did not allow any adjustments for the preceding fiscal years.

In 1998 and 1999, the Secretary collected the insurance premiums and transferred them to the JUA in accordance with Law 253.[7] The JUA then set aside a portion of these premiums in the Reserve. Beginning in 2000, however, the Secretary discontinued the transfer of compulsory liability insurance premiums to the JUA in an attempt to ease the Commonwealth's cash-flow problems.[8] On

_____

[7] At oral argument, counsel for the JUA explained that "[p]rior to the year 2000, the premiums were being turned over [by the Secretary] . . . in a term of about 30-60 days," which the JUA found "reasonable, given the bureaucratic process" involved with such transfers.

[8] The record contains conflicting information about when the Secretary began withholding the compulsory insurance premiums. At oral argument before us, in their appellate brief, and in their opposition to Flores Galarza's motion for judgment on the pleadings, the JUA states that the Secretary withheld the insurance premiums beginning in 2000. In the complaint, the JUA likewise states that it was forced to liquidate its investments as early as January 2000 "[a]s a result of the [Secretary's] failure to transfer th[e premiums]." Elsewhere in the complaint, however, the JUA states that the Secretary withheld premiums "[d]uring the past two years," which would mean that the alleged withholding began in approximately February 2001, based on the February 2003 filing date of the complaint. Flores Galarza argues that "although not alleged in the complaint, the supposed withholding of the transfers would have started on March 2001." While our analysis does not require that we resolve this discrepancy, we use for our analysis the earliest date that Flores Galarza is alleged to have withheld the premiums (January 2000), which date is supported by the record at this stage of the proceedings.

-9-

May 30, 2002, the JUA filed a petition for mandamus against the Secretary in the Puerto Rico Superior Court, requesting an order that the Secretary transfer to the JUA the withheld compulsory liability insurance premiums.  By September 2002, the Secretary had withheld approximately $173 million in premiums from the JUA.  Because of the Secretary's failure to transfer the insurance premiums, the JUA was forced to liquidate approximately $98 million of investments in order to comply with its own cash-flow needs.  The liquidation of the JUA's investments, together with the lost opportunity to invest new premiums, resulted in a loss to the JUA of $14.2 million in interest.  Despite the Secretary's withholding of premiums, the JUA continued to reimburse privately insured motorists and their insurers from its own funds.  From January 2002 through September 2002, the JUA reimbursed third parties out-of-pocket a total of $13.6 million ("Out-of-Pocket Funds").

## C.  The 2002 Amendment to Law 253

On September 11, 2002, the Puerto Rico Legislature amended Law 253, 2002 P.R. Laws 230 ("2002 Amendment"), to require the JUA to turn over to the Secretary all funds held in the Reserve as of December 31, 2001 (i.e., $73 million), and to continue providing such funds every two years thereafter.  The 2002 Amendment requires the Secretary to keep these funds in a fiduciary capacity for five years, to be reimbursed to owners of privately

-10-

insured motor vehicles and their insurers who seek refunds, after which time the funds become the property of the Commonwealth and pass to the general fund of the Commonwealth Treasury.[9]  The 2002 Amendment also provides that any excess funds in the Reserve, that is, any funds included in the Reserve based on estimates which exceed the actual amount owed to third parties (the Overstated Reserve Funds), shall be immediately available for use by the Commonwealth.  Income generated from the funds provided to the Secretary shall also be immediately available for use by the Commonwealth.  Lastly, while the Secretary continues to transfer to the JUA the total amount of compulsory liability insurance premiums, the 2002 Amendment allows the Secretary to deduct from these premiums a fee for the collection service it performs.

**D.  The 2002 Settlement**

In November 2002, pursuant to a settlement stipulation in the mandamus action in the Puerto Rico Superior Court, the Secretary transferred to the JUA a significant portion of the $173 million in insurance premiums that had been withheld ("2002 Settlement").[10]  Rather than transferring the full amount of funds

---

[9] The 2002 Amendment thus allocates the seven-year period provided by the general provisions of Puerto Rico's Insurance Code, P.R. Laws Ann. tit. 26, § 2603, among the JUA (which holds the funds for two years) and the Secretary (who holds the funds for five additional years), after which time the funds lapse to the general fund of the Commonwealth Treasury.

[10] In his answer to the JUA's complaint, Flores Galarza asserts that, by November 2002, he had paid the JUA approximately $85.8

-11-

withheld, however, the Secretary retained approximately $73 million

– an amount corresponding to the amount of funds in the Reserve as

of December 2001, which the JUA was required to turn over to the

Secretary pursuant to the 2002 Amendment.

**II.**

In February 2003, the JUA filed a complaint under 42

U.S.C. § 1983 against Flores Galarza in his personal capacity and

in his official capacity as Secretary of the Treasury.[11]  In the

complaint, the JUA alleged that Flores Galarza took the JUA's

---

million ($8,576,709.37 on October 23, 2002 and $77,190,384.31 on November 13, 2002), which amount represented "all the moneys" owed to the [JUA]."  While the JUA's complaint suggests that the amount paid by Flores Galarza was closer to $100 million, what matters for purposes of our analysis is the amount which Flores Galarza did not pay – $73 million.  The parties do not dispute that these funds were never paid to the JUA.

[11] Defendant-Appellant Annabelle Rodríguez, then the Secretary of Justice of the Commonwealth of Puerto Rico, is not listed as a defendant in either the complaint or in the district court order that is the subject of this appeal.  The first mention of Rodríguez comes in the Notice of Interlocutory Appeal, which references her by political office only, not by name.  The parties refer to Rodríguez again – this time, in her official capacity as Secretary of Justice – in the caption on their briefs before us, but neither party makes any argument respecting her.  Assuming that Rodríguez was properly joined as a party to this action, she ceased to be a party when she left her post as Secretary of Justice in 2004 and was succeeded by William Vazquez Irizarry, who was, in turn, succeeded by the present Secretary of Justice, Roberto J. Sánchez Ramos.  See Fed. R. Civ. P. 25(d).  We therefore do not reach Rodríguez's interests here.  Furthermore, since neither the complaint nor the district court order lists the Secretary of Justice as a party, and since neither party argues that we should adjudicate the interests of the Secretary of Justice in this appeal, we do not reach the interests of Sánchez Ramos.  On remand, it will be important for the district court to clarify Sánchez Ramos's status in this litigation.

-12-

property without just compensation and deprived the JUA of its property without due process in violation of the Fifth and Fourteenth Amendments and § 1983.[12] Specifically, the JUA contends that "in order to alleviate the Commonwealth's cash-flow problems," Flores Galarza temporarily withheld "for [an] unreasonable period[] of time" (i.e., from January 2000 through November 2002) $173 million in insurance premiums, which are "the private property of the [JUA]" and "which [Flores Galarza] was bound by law to transfer to JUA."  By temporarily withholding these premiums, the JUA argues, Flores Galarza also wrongfully appropriated $14.2 million in "interest generated by those premiums [which is] also the private property of the [JUA]."  While Flores Galarza subsequently paid to the JUA a large portion of the withheld premiums pursuant to the 2002 Settlement, the JUA argues that by retaining $73 million, an amount of funds equal to the Reserve as of December 2001, Flores Galarza wrongfully appropriated the following amounts: approximately $10 million[13] in Overstated Reserve Funds which do not

---

[12] For the sake of clarity, we note that § 1983 cannot be "violated," as the JUA suggests in the complaint.  "Section 1983 does not confer substantive rights but merely provides a means to vindicate rights conferred by the Constitution or laws of the United States." Wilson v. Spain, 209 F.3d 713, 715 (8th Cir. 2000).  Here, the JUA seeks to vindicate its right under the Fifth and Fourteenth Amendments to be free from an uncompensated taking.

[13] The JUA uses two different percentages to calculate the Overstated Reserve Funds, and therefore arrives at two different totals for such funds.  As noted above, the JUA originally estimated that 25% of all registered motor vehicles were privately insured, and so set aside 25% of all premiums received and

belong to third parties and therefore constitute the JUA's private property; and approximately $13.6 million in Out-of-Pocket Funds which the JUA was forced to pay to third parties from its own funds when Flores Galarza withheld $173 million in insurance premiums to meet the cash-flow needs of the Commonwealth.[14]

---

accumulated them in the Reserve.  In its complaint, the JUA argues that the number of privately insured motor vehicles as of 2001 was actually 17.4%, which means that the JUA overstated the Reserve by approximately $10 million.  In its brief before us and at oral argument, however, the JUA argues that the number of privately insured motor vehicles in 2001 was actually 19.3%, which means that the Reserve was overstated by approximately $8 million.  Counsel for the JUA also explained at oral argument that the Insurance Commissioner used the higher percentage in adjusting the Reserve for fiscal year 2001.  The Secretary says nothing about this discrepancy.  Because we must draw all reasonable inferences in favor of the non-movant when considering a motion for judgment on the pleadings, and because the 17% figure set forth in the complaint would presumably yield a higher damages award for the JUA than the 19% figure, i.e., $10 million as opposed to $8 million, we use the lower percentage yielding the higher damages amount for purposes of our analysis.

We note that even that amount might understate the damages figure.  If, as the JUA indicates, the Reserve is based on the estimated total number of privately insured vehicles – in an attempt to reflect the greatest number of owners who might be entitled to a refund – the Reserve would contain more than the amount needed for reimbursement to the extent that any of the privately insured owners had avoided payment of the compulsory insurance premium by presenting a Certificate of Compliance.  Such owners would not be entitled to a refund, but the Reserve would include enough to reimburse them based on their private insurance status.

[14] The record does not contain the 2002 Settlement.  Therefore, it is not clear whether the JUA is suing for more than they agreed to in the settlement.  Because the record does not permit us to answer this question, and because Flores Galarza does not raise the issue, we do not address it.

-14-

The JUA requested relief in the form of a declaratory judgment that Flores Galarza "infringed upon the rights guaranteed under the Takings Clause and the Fourteenth Amendment's Due Process Clause" by temporarily withholding the insurance premiums and permanently taking the interest generated by those premiums, the Overstated Reserve Funds, and the Out-of-Pocket Funds. Because the JUA does not argue that Flores Galarza's taking of property violated its substantive or procedural due process rights under the Fourteenth Amendment, the JUA appears to invoke the Fourteenth Amendment only for purposes of bringing a Fifth Amendment Takings claim against Flores Galarza. See Chi., Burlington & Quincy R.R. Co. v. City of Chi., 166 U.S. 226, 239 (1897) (holding that the Takings Clause of the Fifth Amendment is applicable to the states through the Fourteenth Amendment). Our Fourteenth Amendment inquiry is therefore limited to the JUA's takings claim.

The JUA also sought injunctive relief enjoining Flores Galarza, in his official capacity, from "engaging in violations of JUA's [constitutional] rights," that is, from withholding any more insurance premiums.[15] In addition, it sought to enjoin him from "[a]ttempting to enforce or impose upon JUA the terms and conditions of [the 2002 Amendment] . . . inasmuch as they amount to

---

[15] The JUA conceded at oral argument that the Secretary resumed transfer of the insurance premiums following the filing of this action in February 2003, thereby "correct[ing]" the "situation which caused this problem . . . for the time being."

an unconstitutional taking," that is, from requiring the JUA to transfer funds accumulating in the Reserve to the Secretary every two years (which funds must be retained by the Secretary for an additional five years before lapsing to the general fund),[16] and from retaining interest income accruing on the Reserve funds as well as any excess Reserve funds, i.e., the Overstated Reserve Funds that are not actually owed to third parties (which funds shall lapse immediately to the general fund). Finally, the JUA sought from Flores Galarza, in his personal capacity, approximately $38 million in damages: $10 million in Overstated Reserve Funds, $13.6 million in Out-of-Pocket Funds, and $14.2 million in lost interest as a result of Flores Galarza's taking of the insurance premiums.

Flores Galarza filed a motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c), arguing that: the JUA lacked standing to sue Flores Galarza in any capacity; Eleventh Amendment immunity barred the JUA from suing Flores Galarza in his official capacity; and the doctrine of qualified immunity barred the JUA from suing Flores Galarza in his personal capacity. The district court denied Flores Galarza's motion, holding that the JUA

_____

[16] While the JUA seeks to enjoin the Secretary from enforcing the terms of the 2002 Amendment, which requires the JUA to transfer funds in the Reserve to the Secretary every two years, the JUA does not challenge the general provisions of Puerto Rico's Insurance Code, P.R. Laws Ann. tit. 26, §§ 2601-2607, which require that any premiums not claimed within seven years must be paid to the Insurance Commissioner.

-16-

was not an arm of the state and therefore was not precluded from suing Flores Galarza;[17] that Flores Galarza was not entitled to Eleventh Amendment immunity because the declaratory and injunctive relief sought by the JUA was prospective, as was the JUA's claimed right to "money allegedly unconstitutionally attached" by Flores Galarza, i.e., "the insurance premiums for the compulsory liability insurance [and] . . . certain funds belonging to JUA"; and that Flores Galarza was not entitled to qualified immunity because the JUA alleged a constitutional violation that was well established at the time of the alleged conduct. Flores Galarza filed a motion for reconsideration that was also denied. This interlocutory appeal followed.

## III.

We address in this section various preliminary issues, including the JUA's standing and the rationale supporting interlocutory review. We raised two issues <u>sua</u> <u>sponte</u>, mindful of our obligation to consider the basis of appellate jurisdiction, even if the parties have assumed its existence. See <u>Espinal-Dominguez</u> v. <u>Puerto Rico</u>, 352 F.3d 490, 495 (1st Cir. 2003). After

---

[17] The court denied Flores Galarza's arm-of-the-state claim without prejudice, noting that Flores Galarza could "present the issue again via summary disposition[,] providing evidence as to whether the state bore legal liability for the entities['] debts or the risk that the damages will be paid from the public treasury." Instead of moving for summary judgment or providing any new evidence, Flores Galarza filed this interlocutory appeal because of the court's immunity rulings.

oral argument, we asked the parties to submit supplemental briefs addressing the following questions: (1) whether the JUA's claim meets the prudential ripeness requirements of the Supreme Court's jurisprudence on takings, and (2) whether the res judicata doctrine bars our review.  As we discuss below, neither of those doctrines precludes our jurisdiction.  Nor do we find any other jurisdictional barriers to this interlocutory appeal.

## A.  Availability of Interlocutory Review

Generally speaking, appeals are permitted only from final judgments of the district court.  28 U.S.C. § 1291.  There are, however, several exceptions.  "Chief among these is the so-called collateral order doctrine," by which "an order may be appealed immediately if it 'finally determine[s] claims of right separable from, and collateral to, rights asserted in the action, too important to be denied review and too independent of the cause itself to require that appellate consideration be deferred until the whole case is adjudicated.'"  Espinal-Dominguez, 352 F.3d at 495 (quoting Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949)).

Orders denying claims of Eleventh Amendment immunity and qualified immunity, to the extent they turn on issues of law, fall within the ambit of this exception, and are thus immediately appealable to this Court.  See P.R. Aqueduct & Sewer Auth. v.

<u>Metcalf & Eddy, Inc.</u>, 506 U.S. 139, 143 (1993) ("[O]rders denying individual officials' claims of . . . qualified immunity are among those that fall within the ambit of [the collateral order doctrine]. . . . [W]e agree[] that the same rationale ought to apply to claims of Eleventh Amendment immunity made by States and state entities possessing a claim to share in that immunity.") (citations and footnote omitted); <u>Pagán</u> v. <u>Calderón</u>, 448 F.3d 16, 26 (1st Cir. 2006) (stating that denial of qualified immunity is an appealable final decision). Flores Galarza claims that, even on the facts construed in the light most favorable to the JUA, he is entitled to Eleventh Amendment immunity in his official capacity and qualified immunity in his personal capacity as a matter of law. The district court's denial of these claims thus falls within the collateral order doctrine.

**B. Ripeness**

A plaintiff frequently must scale "two independent prudential hurdles" before bringing a takings claim against state entities in federal court. <u>Suitum</u> v. <u>Tahoe Reg'l Planning Agency</u>, 520 U.S. 725, 733-34 (1997). The Supreme Court explained in <u>Williamson County Reg'l Planning Comm'n</u> v. <u>Hamilton Bank of Johnson City</u>, 473 U.S. 172, 194 (1985), that such a plaintiff must demonstrate that he has both received a final decision from the state on the use of his property and "sought 'compensation through

the procedures the State has provided for doing so,'" <u>Suitum</u>, 520 U.S. at 734 (quoting <u>Williamson County</u>, 473 U.S. at 194).

The plaintiff in <u>Williamson County</u> had alleged that the application of various zoning laws and regulations to its property in Tennessee amounted to a taking of that property. The Supreme Court held that the claim was not ripe because the plaintiff had "not yet obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, nor utilized the procedures Tennessee provides for obtaining just compensation." 473 U.S. at 186. The Court noted that the Board of Zoning Appeals had the power to approve variances to the zoning ordinance, and the Planning Commission could grant variances from the subdivision regulations. The plaintiff, however, had not sought such variances, and thus, "respondent has not yet obtained a final decision regarding how it will be allowed to develop its property." <u>Id.</u> at 190.

The Court held that the claim also was not ripe for a second reason: the plaintiff had not sought recovery through the state's inverse condemnation procedure, under which a property owner may seek just compensation for an alleged taking of property effected by restrictive zoning laws or development regulations. <u>Id.</u> at 196. The Court explained that, because the Fifth Amendment proscribes not the taking of property, but takings <u>without just compensation</u>, "[if] the government has provided an adequate process

for obtaining compensation, and if resort to that process 'yield[s] just compensation,' then the property owner 'has no claim against the Government' for a taking." Id. at 194-95 (alteration in original) (quoting Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1013 n.21 (1984)). Because the plaintiff in Williamson County "ha[d] not shown that the inverse condemnation procedure is unavailable or inadequate," the takings claim was premature "until it has utilized that procedure," id. at 197. Cf. González-Álvarez v. Rivero-Cubano, 426 F.3d 422, 427 (1st Cir. 2005) (finding no Williamson County ripeness barriers where plaintiffs claimed that cancellation of their milk production quotas violated the Takings Clause: "Since in this case, the state has always clearly denied that any compensation would be due and there is no state remedy available for seeking compensation, the second hurdle falls away.").

For multiple reasons, the Williamson County prudential ripeness concerns are inapposite here. First, to the extent that the JUA is making a facial statutory challenge, its takings claim need not be brought first to a Commonwealth body, either administrative or judicial. See Suitum, 520 U.S. at 736 n.10 ("'[F]acial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed, but face an 'uphill battle,' since it is difficult to demonstrate that '"mere enactment"' of a piece of legislation 'deprived [the owner] of economically viable use of [his] property.'") (citations omitted);

<u>Yee</u> v. <u>City of Escondido</u>, 503 U.S. 519, 534 (1992) (finding petitioners' facial challenge ripe because it "does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated"); <u>Quicken Loans, Inc.</u> v. <u>Wood</u>, 449 F.3d 944, 953 (9th Cir. 2006) (finding that a facial takings claim was ripe when the challenged statutes were enacted); <u>Pharm. Care Mgmt. Ass'n</u> v. <u>Rowe</u>, 429 F.3d 294, 307 (1st Cir. 2005) ("[A] facial challenge is usually ripe 'the moment the challenged regulation or ordinance is passed,'" but "'face[s] an uphill battle.'" (alterations in original)(citations omitted)). The JUA arguably has stated two facial challenges: (1) that Law 253 effects a taking in failing to provide for the transfer to the JUA of interest earned on its money during the time the Commonwealth holds the funds; and (2) that the 2002 Amendment effects a taking by requiring transfer to the Commonwealth of the <u>excess</u> reserve funds, some of which belong to the JUA, and by explicitly "taking" the interest on those funds to use for Commonwealth operations.

More significantly, however, the <u>Williamson County</u> requirements are not fully applicable to the type of taking alleged here. The Court in <u>Suitum</u> noted that <u>Williamson County</u> identified "two independent prudential hurdles to a <u>regulatory</u> takings claim brought against a state entity in federal court." 520 U.S. at 733-34 (emphasis added). This is not a regulatory takings case. The

-22-

JUA has alleged a physical taking – "a direct government appropriation . . . of private property," Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005) – and the analysis for such a claim differs from that of a regulatory taking. See infra at Section V(A)(2). We previously have held that the finality prong of Williamson County is inapplicable to physical takings and that only the "just compensation" prong remains. See Pascoag Reservoir & Dam LLC v. Rhode Island, 337 F.3d 87, 91-92 (1st Cir. 2003) ("In a physical taking case, the final decision requirement is relieved or assumed . . . . However, . . . '[c]ompensation must first be sought from the state if adequate procedures are available.'") (citations omitted).

Even if both Williamson County prerequisites applied, however, they would not foreclose our jurisdiction. The case law addressing the first "hurdle" focuses on whether the administrative body responsible for applying the challenged regulations has completed discretionary review of the plaintiff's particular situation. Here, there is no pending administrative process that could, through a variance, waiver or other discretionary decision, modify the statute's impact on the JUA.[18]

---

[18] The Court in Williamson County emphasized the distinction between the finality requirement it was describing and the need to exhaust remedies, which is not a prerequisite to a suit brought under § 1983. The Court explained:

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with

-23-

Nor does the second "hurdle" – the need to seek compensation through procedures provided by the state – pose a barrier here.   See Suitum, 520 U.S. at 734 ("The second hurdle stems from the Fifth Amendment's proviso that only takings without

whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. . . .

The difference is best illustrated by comparing the procedure for seeking a variance with the procedures that, under Patsy[v. Florida Board of Regents, 457 U.S. 496 (1982)], respondent would not be required to exhaust. While it appears that the State provides procedures by which an aggrieved property owner may seek a declaratory judgment regarding the validity of zoning and planning actions taken by county authorities, respondent would not be required to resort to those procedures before bringing its § 1983 action, because those procedures clearly are remedial.  Similarly, respondent would not be required to appeal the Commission's rejection of the preliminary plat to the Board of Zoning Appeals, because the Board was empowered, at most, to review that rejection, not to participate in the Commission's decisionmaking.

Resort to those procedures would result in a judgment whether the Commission's actions violated any of respondent's rights.   In contrast, resort to the procedure for obtaining variances would result in a conclusive determination by the Commission whether it would allow respondent to develop the subdivision in the manner respondent proposed. The Commission's refusal to approve the preliminary plat does not determine that issue; it . . . leaves open the possibility that respondent may develop the subdivision according to its plat after obtaining the variances.   In short, the Commission's denial of approval does not conclusively determine whether respondent will be denied all reasonable beneficial use of its property, and therefore is not a final, reviewable decision.

473 U.S. at 193-94 (citations omitted).

-24-

'just compensation' infringe that Amendment; 'if a State provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation.'" (quoting Williamson County, 473 U.S. at 195)). Most commonly in regulatory takings cases – which typically involve land-use regulation – such a procedure is a state inverse condemnation proceeding.[19] See, e.g., Williamson County, 473 U.S. at 196; Urban Developers LLC v. City of Jackson, 468 F.3d 281, 295 (5th Cir. 2006); SFW Arecibo, Ltd. v. Rodríguez, 415 F.3d 135, 139 (1st Cir. 2005) (noting that "[a]dequate procedures for seeking just compensation are available under Puerto Rico law," and

---

[19] The Supreme Court explained the "important legal and practical differences between an inverse condemnation suit and a condemnation proceeding" as follows:

> Although a landowner's action to recover just compensation for a taking by physical intrusion has come to be referred to as "inverse" or "reverse" condemnation, the simple terms "condemn" and "condemnation" are not commonly used to describe such an action. Rather, a "condemnation" proceeding is commonly understood to be an action brought by a condemning authority such as the Government in the exercise of its power of eminent domain. . . .
>
> . . . .
>
> . . . The phrase "inverse condemnation" appears to be one that was coined simply as a shorthand description of the manner in which a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted.

United States v. Clarke, 445 U.S. 253, 255-57 (1980).

referring specifically to an inverse condemnation remedy). For takings claims asserted against the federal government, the applicable procedure is a claim brought under the Tucker Act. Williamson County, 473 U.S. at 195 ("[T]aking claims against the Federal Government are premature until the property owner has availed itself of the process provided by the Tucker Act." (citation omitted)); see also Student Loan Mktg. Ass'n v. Riley, 104 F.3d 397, 401 (D.C. Cir. 1997) ("Normally a taking claim against the federal government must be brought as a suit for money damages (i.e., the 'just compensation' that the Constitution assures) under the Tucker Act . . . .") (citing 28 U.S.C. § 1491).

The key component of this prong of Williamson County is the availability of a process that is particularly aimed at providing compensation when government action effects a taking. See, e.g., McNamara v. City of Rittman, 473 F.3d 633, 638 (6th Cir. 2007) (noting that "the critical inquiry" after Williamson County is whether the state has "'reasonable, certain[] and adequate'" compensation procedures, and identifying mandamus as the vehicle available to Ohio landowners who were not provided the required "appropriation proceeding") (citations omitted).[20] In our view,

---

[20] Under Ohio law, a government actor seeking to take property must bring a statutory "appropriation proceeding" against the landowner. Coles v. Granville, 448 F.3d 853, 865 (6th Cir. 2006). Because Ohio has no "inverse condemnation or other direct, statutory cause of action for plaintiffs seeking just compensation for a taking," the state's courts over time concluded that property owners who believe a taking has occurred without the statutory process could

-26-

such procedures do not include litigation of a state takings claim or any general remedial cause of action under state law. Rather, the Supreme Court must have had in mind only those procedures specifically designed by the state to avoid constitutional injury in the first instance by providing a means for a plaintiff to obtain compensation for the government's taking of property.

An inverse condemnation cause of action is a classic example of such a particularized procedure; it gives a property owner aggrieved by government conduct the opportunity to obtain compensation, thereby avoiding an unconstitutional taking. Requiring plaintiffs to avail themselves of such a procedure before bringing a federal takings claim protects the state's opportunity to use the scheme it designed specifically to avoid constitutional injury. By contrast, requiring plaintiffs to invoke any generally available state procedure that might provide a remedy for an uncompensated taking before bringing a federal claim would "transform[] Williamson County's finality rule into a rule of exhaustion," Washlefske v. Winston, 234 F.3d 179, 183 (4th Cir. 2000).

> This result would be in diametric opposition
> to a foundational decision of modern § 1983
> jurisprudence, Monroe v. Pape, which held that

---

initiate a mandamus action "to force the government actor into the correct appropriation proceeding." Id. In Ohio, therefore, mandamus as a vehicle to obtain an appropriation proceeding effectively substitutes for the more common inverse condemnation process.

> "[t]he federal remedy is supplementary to the State remedy, and the latter need not be first sought and refused before the federal one is invoked."

Id. (quoting <u>Monroe</u> v. <u>Pape</u>, 365 U.S. 167, 183 (1961)). <u>See</u> <u>also</u> <u>Liberty Mut. Ins. Co.</u> v. <u>Brown</u>, 380 F.3d 793, 797-98 (5th Cir. 2004) (noting that "the exhaustion of state administrative remedies is not an independent federal law prerequisite to a federal takings claim," but that plaintiff was obliged to seek compensation in an inverse condemnation action).

The holding in <u>Williamson County</u> that a federal takings claim is not ripe until the plaintiff has sought compensation through state procedures has drawn substantial criticism, including from Chief Justice Rehnquist in his concurring opinion in <u>San Remo Hotel</u> v. <u>City of San Francisco</u>, 545 U.S. 323 (2005), because of the risk that preclusion law will result in barring "litigants who go to state court to seek compensation . . . [from] assert[ing] their federal takings claims in federal court," <u>id.</u> at 351. <u>See</u> <u>also</u>, <u>e.g.</u>, J. David Brenner, You Can Check Out But You Can Never Leave: The Story of <u>San Remo Hotel</u> – the Supreme Court Relegates Federal Takings Claims to State Courts Under A Rule Intended to Ripen the Claims for Federal Review, 33 B.C. Envtl. Aff. L. Rev. 247 (2006); Scott Keller, Judicial Jurisdiction Stripping Masquerading as Ripeness: Eliminating the <u>Williamson County</u> State Litigation Requirements for Regulatory Takings Claims, 85 Tex. L. Rev. 199 (2006) ("Judicial Jurisdiction Stripping"). The risk of preclusion

-28-

becomes a reality when, in the course of ruling on the plaintiff's compensation claim, the state court reaches federal constitutional issues. See San Remo Hotel, 545 U.S. at 342-43; see also Torromeo v. Town of Fremont, 438 F.3d 113, 117 (1st Cir. 2006) (affirming res judicata dismissal of federal takings claim where claim "was actually litigated to a final judgment on the merits in the state court") (emphasis in original). At least some of the commentary assumes that federal takings plaintiffs would need to pursue an available state takings claim, among other procedures, to meet the Williamson County requirements – which almost inevitably would lead to an overlap with federal principles. See, e.g., Judicial Jurisdiction Stripping, supra at 204-05.

We consider a state takings claim to be remedial in nature, however, and not a "procedure[] the State has provided for [seeking compensation]," Williamson County, 473 U.S. at 194. See id. at 194 n.13 (contrasting review procedures with "procedures that allow a property owner to obtain compensation for a taking"). A takings claim seeks damages for the unconstitutional taking of property without due compensation. By contrast – as discussed above – an inverse condemnation proceeding is designed to enable plaintiffs to obtain compensation – which, if granted, would avoid the alleged constitutional violation that the takings claim is intended to remedy. This is a subtle, but important distinction. As with more general remedial provisions, requiring a state takings

-29-

claim as a prerequisite to a federal takings claim effectively would impose an exhaustion requirement – which the Supreme Court explicitly said it did not do in Williamson County. Moreover, although we have not done a survey, we suspect that, like Puerto Rico, most state constitutions have takings provisions. See P.R. Const. Art. II, §9. We thus think it likely that the Supreme Court would have made explicit reference to a state takings claim if it deemed such a cause of action a relevant "procedure" for purposes of the second prong of Williamson County.[21]

---

[21] In his concurrence, our colleague notes that the Supreme Court addressed exhaustion in the context of the finality requirement but did not suggest a similar limitation on the state litigation prong. Although the Court's primary discussion of exhaustion occurred with respect to finality, it reiterated that review procedures need not be exhausted when explaining the need for "a property owner [to] utilize procedures for obtaining compensation." 473 U.S. at 194 n.13.

We note, in addition, that at least some of the cases identified in the concurrence as rejecting our limitation on the litigation requirement are not wholly in conflict with our view that Williamson County requires resort to a procedure akin to inverse condemnation. For example, in Villager Pond, Inc. v. Town of Darien, 56 F.3d 375 (2d Cir. 1995), the court relied on a Connecticut state court decision that had held that the state's takings clause "may be used as the basis of an inverse condemnation action to recover compensation for property taken from private individuals, even in the absence of a separate statutory remedy." Id. at 380. See also id. at 381 ("The inverse condemnation requirement of Williamson applies whenever compensation is sought for land that is taken . . . ."). Similarly, in Austin v. City & County of Honolulu, 840 F.2d 678, 681 (9th Cir. 1987), the court noted that, "[u]ntil the state courts establish that landowners may not obtain just compensation through an inverse condemnation action under any circumstances [including under the state constitution's takings provision], Hawaii procedures are adequate within the terms of Williamson County and [plaintiff's] failure to use them cannot be excused." Our view does not exclude the possibility that a state explicitly could create a non-statutory inverse condemnation

-30-

Here, no Commonwealth administrative process or cause of action has been identified through which a claimant is expected to seek compensation in the unusual circumstance of an alleged unconstitutional taking arising from the government's appropriation of funds.  Cf. González-Álvarez, 426 F.3d at 427 (noting the lack of an available state process for seeking compensation for cancellation of milk production quotas); SFW Arecibo, 415 F.3d at 139 (noting Puerto Rico's inverse condemnation procedure for land-based takings claims).

Indeed, another line of cases suggests the inapplicability of the Williamson County prerequisites to a taking that involves the direct appropriation of funds.  In Eastern Enterprises v. Apfel, 524 U.S. 498 (1998) (plurality opinion), the Supreme Court considered a challenge to the Coal Act, which established a mechanism for funding health care benefits for coal industry retirees.  Id. at 504.  Under the Act, private coal operators were required to contribute to the payment of premiums to

procedure.  Cf. Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 99 (2d Cir. 1992) (rejecting the "contention that only a statutory compensation scheme can suffice").  We disagree with the Ninth Circuit's implication, however, that a federal takings claim is unripe if a plaintiff has not litigated a state claim where the state has not specifically utilized its takings clause to establish a compensatory process (and no other compensatory process has been identified).
     As our discussion and the difference of opinion among our own panel members indicate, there is substantial tension among the various doctrines at issue in this context – ripeness, exhaustion and preclusion – and further guidance from the Supreme Court seems necessary to resolve the uncertainties.

fund such benefits.   One such operator, Eastern, brought suit claiming that the Act, either on its face or as applied, violated substantive due process and constituted a taking of its property in violation of the Fifth Amendment.   The Supreme Court considered whether the takings claim needed to be asserted first under the Tucker Act, which, as noted above, usually must be a preliminary step in a takings action against the federal government.

The plurality observed that Eastern was not seeking compensation from the government; it was requesting declaratory and injunctive relief against enforcement of the act by the Commissioner of Social Security.   The Justices noted conflicting lower court precedent on whether a claim for equitable relief under the Takings Clause, even without a request for damages, must be brought first under the Tucker Act.   Id. at 520-21.   The plurality rejected such a prerequisite, stating that "Congress could not have contemplated that the Treasury would compensate coal operators for their liability under the Act, for '[e]very dollar paid pursuant to a statute would be presumed to generate a dollar of Tucker Act compensation.'"   Id. at 521 (quoting In re Chateaugay Corp., 53 F.3d 478, 493 (2d Cir. 1995)).   The Court plurality continued:

> Accordingly, the "presumption of Tucker Act availability must be reversed where the challenged statute, rather than burdening real or physical property, requires a direct transfer of funds" mandated by the Government. [In re Chateaugay, 53 F.3d at 493.]   In that situation, a claim for compensation "would entail an utterly pointless set of

activities." <u>Student Loan Marketing Ass'n</u> v. <u>Riley</u>, 104 F.3d 397, 401 [(D.C. Cir. 1997)]. Instead, . . . the Declaratory Judgment Act "allows individuals threatened with a taking to seek a declaration of the constitutionality of the disputed governmental action before potentially uncompensable damages are sustained."

<u>Id.</u> (citation omitted). Five members of the Court went on to conclude that the Coal Act's application to Eastern was unconstitutional, but Justice Kennedy relied on due process, rather than takings, principles. <u>See</u> <u>id.</u> at 537, 539.

This case differs from <u>Apfel</u> because, among other distinctions, it does not involve the federal government and the Tucker Act. Nonetheless, the nature of the claim – that Puerto Rico's Secretary of the Treasury improperly withheld money belonging to the JUA so that it may be used for public purposes – strikes us as equivalent to the complaints about the "direct transfer of funds" at issue in <u>Apfel</u> and the decisions it cites. Application of the <u>Williamson County</u> prerequisites here similarly could only "'entail an utterly pointless set of activities.'" For that reason, and the others we have noted, we conclude that <u>Williamson County's</u> prudential factors do not prevent our review of the JUA's takings claim.

**C. Standing**

Flores Galarza challenges the JUA's statutory standing, arguing that the JUA, as a "state-created entity," lacks standing to "challenge actions taken by the state that created it [because]

-33-

it is [not] absolutely clear from the enabling statute that such access was expressly intended by the state legislature." The JUA contends that, while it was "created via an official act of the state," the JUA is not an "arm of the state [with] no constitutional rights to assert against the state which created it."[22]

Flores Galarza's argument is precluded by our case law. In Arroyo-Melecio, we stated that, while "[t]he JUA is under some direction by the commonwealth," it is "private in nature" and is therefore "not an agency of the commonwealth." 398 F.3d at 62. A private corporation may allege a constitutional violation under § 1983. See Ill. Clean Energy Cmty. Found. v. Filan, 392 F.3d 934, 936-37 (7th Cir. 2004) (holding that state-created foundation was not a state agency and therefore could sue the state for taking its property); Advocates for the Arts v. Thomson, 532 F.2d 792, 794 (1st Cir. 1976) ("That [plaintiff] is a corporation has no bearing on its standing to assert violations of the first and fourteenth

---

[22] Neither Flores Galarza nor the JUA addresses the threshold question of whether we may consider Flores Galarza's standing challenge in this interlocutory appeal. Although not all circuits agree, see, e.g., Triad Assocs., Inc. v. Robinson, 10 F.3d 492, 496 n.2 (7th Cir. 1993) ("[T]hat we have jurisdiction to review the district court's denial of qualified immunity is not sufficient to confer on us jurisdiction to review [standing challenges] presented to the district court." (citation omitted)), we previously have held that appellate jurisdiction extends to issues of standing on interlocutory appeal of a denial of immunity. See Pagán, 448 F.3d at 26-27. We therefore may review Flores Galarza's challenge to the JUA's standing.

-34-

amendments under 42 U.S.C. [§] 1983."). The JUA is therefore a proper plaintiff in this case.

**D. Res Judicata**

In his supplemental brief, Flores Galarza asserts that the JUA seeks "exactly the same remedy that it previously sought" – and failed to receive – in the Commonwealth court, and argues that the doctrine of res judicata bars the federal court from reaching a different outcome on identical claims involving the same parties. In response, the JUA emphasizes that both of the Commonwealth court's rulings – the Partial Judgment issued in July 2003 and the Judgment issued in September 2003 – were "without prejudice," and it argues that, under Puerto Rico law, a judgment without prejudice is not an adjudication on the merits that would trigger res judicata consequences. See Pueblo Int'l, Inc. v. Cruz, 17 P.R. Offic. Trans. 275 (1986) (Hernandez Denton, J., concurring and dissenting) (citing Fresh-O-Baking Co. v. Molinos de P.R., 103 D.P.R. 509, 514 (1975)).

We do not reach the substantive res judicata question, however, because we conclude that it is outside the limited sphere of this interlocutory appeal. Although we have not previously held explicitly that res judicata, unlike standing, may not be reviewed along with immunity issues, we intimated as much in Nieves-Márquez

v. Puerto Rico, 353 F.3d 108, 123 (1st Cir. 2003), where we considered the scope of an interlocutory appeal from the denial of a motion to dismiss based on Eleventh Amendment immunity. We cited there the Supreme Court's decision in Swint v. Chambers County Comm'n, 514 U.S. 35 (1995), where the Court held that a court of appeals does not have discretion to exercise pendent appellate jurisdiction in an interlocutory appeal from a denial of qualified immunity unless "the otherwise unappealable issue is [] 'inextricably intertwined' with the issue on collateral order appeal." 353 F.3d at 123 (quoting Swint, 514 U.S. at 48-51). We concluded that the question whether a cause of action for damages exists is "inextricably intertwined with the issue of Eleventh Amendment immunity" and therefore could be addressed in an interlocutory appeal. Id.

In so ruling, however, we noted the Third Circuit's decision in Bell Atlantic-Pennsylvania, Inc. v. Pennsylvania Public Utilities Commission, 273 F.3d 337, 343-45 (3d Cir. 2001), on the "very different issue[]" of whether denial of a motion to dismiss on res judicata grounds was immediately appealable under the collateral order doctrine. The Third Circuit held that it was not, and we observed that, "[l]ike the Third Circuit, we agree that not every issue raised by the denial of a pre-trial motion to dismiss may be reached on collateral order appeal; indeed most may not be." 353 F.3d at 124. We construe that observation as an endorsement of

-36-

the Third Circuit's refusal to address res judicata in an interlocutory appeal. Moreover, we find a similar perspective in the Supreme Court's decision in Digital Equipment Corp. v. Desktop Direct, Inc., 511 U.S. 863 (1994). In that case, the Court listed preclusion among a collection of claims that arguably relate to a "right not to stand trial" and therefore could plausibly warrant interlocutory appellate review. See id. at 873. The Court, however, cautioned that such claims must be viewed "with skepticism, if not a jaundiced eye," to avoid emasculating Congress's final decision rule. Id. at 871-73. Consistent with this precedent, we conclude that res judicata is not properly addressed at this stage of the case. See, e.g., Timpanogos Tribe v. Conway, 286 F.3d 1195, 1200 (10th Cir. 2002) (finding no basis to review pendent res judicata claim with Eleventh Amendment interlocutory claim); Garramone v. Romo, 94 F.3d 1446, 1452 (10th Cir. 1996) (holding that district court's res judicata ruling could not be reviewed in interlocutory appeal on immunity issues). See generally 15A Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3911.4 at 424-26 (2d ed. 1992) ("[C]ollateral order appeal is not automatically available to review . . . rejection of an argument that repetitious litigation is barred by res judicata . . . .").

**IV.**

**A. Summary of Claims**

Before turning to an analysis of the Eleventh Amendment immunity and qualified immunity claims, we pause to summarize the varied claims for relief made by the JUA. We do so because we must be clear about the precise nature of those claims in conducting the immunity analyses. As noted above, the JUA seeks three kinds of relief. First, the JUA seeks a declaratory judgment against Flores Galarza in his official capacity, declaring that he violated the JUA's constitutional rights by:

(1) withholding $173 million in insurance premiums for an extended period so that the funds could be used to ease the Commonwealth's cash flow problems, before transferring a large portion of those premiums to the JUA pursuant to the 2002 Settlement; and

(2) permanently appropriating: (a) $14.2 million in interest on lost or forgone investments as a result of Flores Galarza's taking of the insurance premiums; (b) $10 million in Overstated Reserve Funds that do not belong to third parties and therefore should have been deducted from the $73 million retained by Flores Galarza; and (c) $13.6 million in Out-of-Pocket Funds that the JUA was forced to pay to third parties from its own funds and therefore should have been deducted from the $73 million retained by Flores Galarza.[23]

---

[23] Flores Galarza helpfully summarizes the alleged permanent appropriations as follows:

Second, the JUA seeks injunctive relief from Flores Galarza in his official capacity, enjoining him from:

(1)  withholding any more insurance premiums; and

(2)  enforcing the terms of the 2002 Amendment, that is, from requiring the JUA to transfer Reserve funds to the Secretary every two years, and from retaining interest income earned on the Reserve funds and any Overstated Reserve Funds (i.e., funds included in the Reserve that are not actually owed to third parties).

Third, the JUA seeks approximately $38 million in damages from Flores Galarza in his personal capacity, that is:  (1) $14.2 million in lost interest as a result of Flores Galarza's taking of the insurance premiums; (2) $10 million in Overstated Reserve Funds; and (3) $13.6 million in Out-of-Pocket Funds.  These items of damage mirror the items identified in the permanent appropriation portion of the demand for declaratory relief.

## B.  Standard of Review

---

The JUA claims that when the Reserve Account was retained, the [Secretary] took its property without just compensation because it withheld the [Overstated Reserve Funds], and did not allow the [Out-of-Pocket Funds] to be debited from the Reserve Account.  The JUA also claims that it is entitled to just compensation for the period of time during which the [Secretary] withheld the transfers of the premiums without transmitting these to the JUA.

Where a district court's denial of Eleventh Amendment immunity and qualified immunity turns upon purely legal questions, our review is de novo. See Rodríguez-Marín v. Rivera-González, 438 F.3d 72, 84 (1st Cir. 2006) (reviewing de novo denial of qualified immunity); Redondo Constr. Corp. v. P.R. Highway & Transp. Auth., 357 F.3d 124, 126 (1st Cir. 2004) (reviewing de novo denial of Eleventh Amendment immunity). "The standard for evaluating a Rule 12(c) motion for judgment on the pleadings is essentially the same as that for deciding a Rule 12(b)(6) motion. '[T]he trial court must accept all of the nonmovant's well-pleaded factual averments as true, and draw all reasonable inferences in his favor.'" Pasdon v. City of Peabody, 417 F.3d 225, 226 (1st Cir. 2005) (quoting Rivera-Gomez v. de Castro, 843 F.2d 631, 635 (1st Cir. 1998)). "Judgment on the pleadings under Rule 12(c) may not be entered unless it appears beyond a doubt that the nonmoving party can prove no set of facts in support of her claim which would entitle her to relief." Feliciano v. Rhode Island, 160 F.3d 780, 788 (1st Cir. 1998).

## C. Eleventh Amendment Immunity

Flores Galarza argues that the Eleventh Amendment bars the JUA's suit against him in his official capacity.[24] He

---

[24] The Eleventh Amendment states that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any

emphasizes that the JUA seeks damages of $10 million in Overstated Reserve Funds, $13.6 million in Out-of-Pocket Funds, and $14.2 million in lost interest during the period in which the insurance premiums were retained, all of which "[are] clearly retrospective in nature."  Flores Galarza misapprehends the JUA's argument. While the complaint is not a model of clarity on this point,[25] the JUA explained in its argument to us and to the district court that

Foreign State."  U.S. Const. amend. XI.  "[N]otwithstanding its plain language," the Eleventh Amendment "prohibit[s federal courts] from hearing most suits brought against a state by citizens of that or any other state."  Metcalf & Eddy, Inc. v. P.R. Aqueduct & Sewer Auth., 991 F.2d 935, 938 (1st Cir. 1993).  "[D]espite the absence of any express reference," the Eleventh Amendment "pertains to Puerto Rico in the same manner, and to the same extent, as if Puerto Rico were a State."  De Leon Lopez v. Corporacion Insular de Seguros, 931 F.2d 116, 121 (1st Cir. 1991).

[25] The complaint states that the "JUA respectfully requests that this Honorable Court order the Secretary of the Treasury to pay the JUA the amount of $38,321,556.83 in order to return to JUA its private property and to compensate JUA for the opportunity cost it has suffered due to the Secretary of the Treasury's violations of JUA's constitutional rights."  However, the complaint does not state whether the JUA's request is directed at Flores Galarza in his official capacity, his personal capacity, or both.  The JUA's request that Flores Galarza "return [] its private property," on the one hand, and "compensate" the JUA, on the other, contributes to this confusion, suggesting that the JUA seeks the return of certain funds in the Commonwealth Treasury from Flores Galarza in his official capacity, and seeks damages from Flores Galarza in his personal capacity.  As the JUA indicated in its brief to the district court, and as it made clear at oral argument before us, the JUA seeks damages for the taking of the funds at issue from Flores Galarza in his personal capacity – the JUA is "not asking to have any money returned to it" by the Commonwealth.  Given the complaint's lack of precision, we understand Flores Galarza's misapprehension of the nature of the JUA's claims.

it is not seeking damages from Flores Galarza in his official capacity.

The JUA states that, while it "seeks damages against Mr. Flores-Galarza in his personal capacity," it seeks only prospective injunctive relief from Flores Galarza in his official capacity – "enjoin[ing him] from continuing to engage in the unconstitutional conduct." (Emphasis added.) At oral argument before us, the JUA stated that it merely seeks to compel the transfer of compulsory liability insurance premiums in the future – a remedy that it argues "is clearly a prospective one." The JUA further argues that "[t]he fact that funds would have to be transferred [in the future] as a result of the injunction requested does not create an Eleventh Amendment bar to the issuance of the injunction" because these funds do not constitute damages, but rather "belong to the JUA and are held by [the Secretary] in a fiduciary capacity."

In many instances, a suit against a state official is a suit against the state, thereby triggering Eleventh Amendment immunity. See Muirhead v. Mecham, 427 F.3d 14, 18 (1st Cir. 2005) ("[A] suit, although nominally aimed at an official, will be considered one against the sovereign 'if the judgment sought would expend itself on the public treasury or domain, or interfere with the public administration, or if the effect of the judgment would be to restrain the Government from acting, or to compel it to

-42-

act.'" (quoting <u>Dugan</u> v. <u>Rank</u>, 372 U.S. 609, 620 (1963)).  While the Eleventh Amendment prohibits a party from bringing suit against a state in federal court, <u>see</u> <u>De Leon Lopez</u>, 931 F.2d at 121, it does not prohibit a party from bringing suit against a state officer in federal court for prospective declaratory or injunctive relief under federal law.[26]  <u>Ex parte Young</u>, 209 U.S. 123, 155 (1908).  <u>See</u> <u>generally</u> Erwin Chemerinsky, <u>Federal Jurisdiction</u> § 7.5, at 424 (4th ed. 2003) (distinguishing prospective injunctive relief against a state officer, which the Eleventh Amendment does not forbid, from "retroactive relief – damages to compensate past injuries," which the Eleventh Amendment does forbid).

In <u>Ex parte Young</u>, the Supreme Court created an exception to Eleventh Amendment immunity "for suits challenging the constitutionality of a state official's action, on the theory that since the state cannot authorize such an unconstitutional action, the officer is 'stripped of his official or representative character and . . . subjected in his person to the consequences of his individual conduct.'"  <u>Parents for Quality Educ. With Integration, Inc.</u> v. <u>Indiana</u>, 977 F.2d 1207, 1209 (7th Cir. 1992)

---

[26] As we noted in <u>Díaz-Fonseca</u> v. <u>Puerto Rico</u>, 451 F.3d 13 (1st Cir. 2006), "[<u>Ex parte Young</u>] does not allow injunctive relief against state officials for violation of <u>state law</u> . . . because '[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law.'"  <u>Id.</u> at 43 (quoting <u>Pennhurst State Sch. & Hosp.</u> v. <u>Halderman</u>, 465 U.S. 89, 106 (1984)).

-43-

(quoting Pennhurst, 465 U.S. at 102). Ex parte Young thus "allows a way around the bar to federal jurisdiction . . . in cases where prospective declaratory or injunctive relief is sought under federal law." Mills v. Maine, 118 F.3d 37, 54 (1st Cir. 1997). Here, the JUA seeks a declaration that the taking of insurance premiums by Flores Galarza in his official capacity violates the Constitution and an injunction enjoining Flores Galarza from enforcing the terms of the 2002 Amendment – that is, from requiring the JUA to transfer Reserve funds every two years and from retaining either the interest earned on those funds or any excess Reserve funds not owed to traditionally insured vehicle owners or their insurers. We agree with the district court that these requests are for prospective declaratory and injunctive relief that is not barred by the Eleventh Amendment.[27] Therefore, the district court's denial of Eleventh Amendment immunity to Flores Galarza in his official capacity was correct.

## D. Official- Versus Personal-Capacity Suits

---

[27] In addition to finding that "[the JUA's] request for injunctive and declaratory relief is prospective," the district court found that "the retention of money allegedly unconstitutionally attached is equitable and subject to injunctive relief exempt from the Eleventh Amendment bar." To the extent that this latter statement may be understood as affording the JUA the right to sue Flores Galarza in his official capacity for damages, we reject this proposition. As discussed above, the JUA does not make this argument and, therefore, neither we nor the district court need reach it. Because we otherwise arrive at the same result as the district court on Eleventh Amendment immunity, any potential error on the part of the district court in its analysis was harmless.

The JUA argues that Flores Galarza, in his personal capacity, temporarily withheld approximately $173 million in compulsory liability insurance premiums for an "unreasonable period[] of time," and, in so doing, appropriated $14.2 million in interest generated by those premiums. The JUA also argues that Flores Galarza personally appropriated $10 million in Overstated Reserve Funds and $13.6 million in Out-of-Pocket Funds.

However, the JUA does not seek to hold Flores Galarza personally liable for the full $173 million in withheld insurance premiums, most of which was subsequently paid to the JUA pursuant to the 2002 Settlement, nor does the JUA seek to hold Flores Galarza personally liable for the full $73 million in Reserve funds retained by Flores Galarza after the 2002 Settlement. Instead, the JUA seeks to hold Flores Galarza personally liable for interest lost on the $173 million plus two portions of the $73 million Reserve – i.e., the Overstated Reserve Funds and Out-of-Pocket Reserve Funds. The total amount sought by the JUA is approximately $38 million, that is, roughly $14.2 million in lost interest, $10 million in Overstated Reserve Funds, and $13.6 million in Out-of-Pocket Funds. Flores Galarza contends that he is not liable in his personal capacity based on qualified immunity.

Before analyzing whether Flores Galarza is entitled to qualified immunity, we pause to note the unusual nature of this personal-capacity suit. We are troubled by the notion that the

-45-

personal-capacity claim against Flores Galarza, by which the JUA seeks enormous personal damages from him, is really a subterfuge for an official-capacity suit that seeks payment from the Commonwealth Treasury. Certainly the line between personal assets and the Commonwealth fisc seems indistinct. The JUA has sued the Secretary of the Treasury; the JUA claims that the Secretary temporarily withheld and permanently appropriated the JUA's funds for the benefit of the Commonwealth; and some of the damages sought by the JUA correspond to funds accumulated in the general fund pursuant to the 2002 Amendment. "'[W]hen the action is in essence one for the recovery of money from the state, the state is the real, substantial party in interest and is entitled to invoke its sovereign immunity from suit. . . .'" Metcalf, 991 F.2d at 939 (quoting Ford Motor Co. v. Dep't of Treasury, 323 U.S. 459, 464 (1945), overruled on other grounds by Lapides v. Bd. of Regents of Univ. Syst. of Ga., 535 U.S. 613 (2002)). There is a plausible view of this case that the demand for damages from Flores Galarza is, in essence, a demand for the recovery of money from the Commonwealth.

In considering that possibility, we have looked closely at Hafer v. Melo, 502 U.S. 21 (1991), a case in which the Supreme Court tried to clarify the distinction between official- and personal-capacity suits. There, the plaintiffs sued the auditor general of Pennsylvania, Hafer, after she fired them from their

jobs, alleging that they were fired for personal reasons in violation of the First Amendment; they sought monetary damages from Hafer personally. The claims against Hafer had nothing to do with her handling of funds in the state treasury, nor did the damages sought bear any relationship to funds accumulated in the state treasury. Id. at 23.

However, the principles set forth in Hafer make the factual distinctions between this case and Hafer seemingly irrelevant. There, the Court said that "the phrase 'acting in their official capacities' is best understood as a reference to the capacity in which the state officer is sued, not the capacity in which the officer inflicts the alleged injury." Id. at 26. Even earlier, the Supreme Court had suggested that in determining whether a suit involves a personal- or official-capacity claim, we should be guided by the complaint or, if not clearly specified in the complaint, by the "[t]he course of proceedings." Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985).

Here, the complaint, in combination with the course of proceedings, see supra note 25, establishes that Flores Galarza is being sued for damages in his personal capacity. If the JUA wishes to seek a personal judgment against Flores Galarza in a ruinous and probably uncollectible amount for actions that he took as the

Commonwealth Treasurer to serve the interests of the Commonwealth, they are entitled to do that. See generally Chemerinsky, supra, § 7.5.2, at 430 ("[T]he fact that a government officer is acting in the scope of official duties is not enough to bar a suit as being in 'official capacity'."). If such a judgment might induce the Commonwealth to indemnify Flores Galarza from the Commonwealth Treasury to spare him from ruin, that likelihood is irrelevant to the personal-capacity determination. See Berman Enters., Inc. v. Jorling, 3 F.3d 602, 606 (2d Cir. 1993) ("Whether or not a state would choose to reimburse an official for damages for constitutional harm he caused in his individual capacity is a matter of no concern to a federal court."). See generally Chemerinsky, supra, § 7.5.2, at 423 ("State indemnification policies are irrelevant for Eleventh Amendment analysis and do not prevent federal court relief against individual officers.").[28] In short, in a suit "against an officer for money damages when the relief would come from the officer's own pocket, there is no Eleventh Amendment bar even though the conduct was part of the

---

[28] As we noted in Díaz-Fonseca, the Commonwealth "generally indemnifies its officials for suits against them in their personal capacities." 451 F.3d at 37 n.26 (citing P.R. Laws Ann. tit. 32, § 3085 ("Every official . . . of the Commonwealth of Puerto Rico who is sued for damages in his personal capacity, when the cause of action is based on alleged violations of the plaintiff's civil rights, due to acts or omissions committed in good faith, in the course of his employment and within the scope of his functions, may request the Commonwealth of Puerto Rico to provide him with legal representation, and to subsequently assume the payment of any judgment that may be entered against his person.")).

officer's official duties.  In such a suit, the officer could claim absolute or qualified immunity as a defense."  Id. at 429.  We turn, therefore, to Flores Galarza's qualified immunity defense.

**V.**

Our starting point is the principle that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  We have used a three-prong analysis for evaluating qualified immunity claims.  Thus, we must determine:

> (1) whether the claimant has alleged the deprivation of an actual constitutional right; (2) whether the right was clearly established at the time of the alleged action or inaction; and (3) if both of these questions are answered in the affirmative, whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.

Wilson v. City of Boston, 421 F.3d 45, 52 (1st Cir. 2005).

## A. First Prong: Alleged Deprivation of Constitutional Right

Here we ask whether the facts, "[t]aken in the light most favorable to the party asserting the injury . . . show the officer's conduct violated a constitutional right[.]"  Saucier v. Katz, 533 U.S. 194, 201 (2001).  As we have noted, "[t]he first prong inquiry at this 12(b)(6) stage is unlikely to be very specific, given that federal civil practice is based on notice

-49-

pleading, where great specificity is not required, and that there is no heightened pleading requirement for civil rights cases." Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 61 (1st Cir. 2004) (citations omitted). The JUA argues that Flores Galarza took its private property without compensation in violation of the Fifth and Fourteenth Amendments, by physically appropriating the insurance premiums, the interest lost as a result of the withholding of those premiums, the Overstated Reserve Funds, and the Out-of-Pocket Funds. This alleged violation of its constitutionally protected property rights, the JUA argues, is thus sufficient to satisfy the first prong of the qualified immunity analysis. Flores Galarza argues that the JUA fails to allege a taking of its property in satisfaction of the first prong of the qualified immunity analysis for two reasons: first, the JUA is a state-created entity, which, like the state itself, lacks the capacity to allege a taking under § 1983; and second, the complaint does not allege the elements of a successful takings claim.

1. Capacity to Allege Constitutional Deprivation

Flores Galarza's argument that the JUA, as a state-created entity, "simply does not enjoy constitutional rights" and thus is "wholly incapable" of setting forth a violation of constitutionally protected property rights, is his standing challenge recast in qualified immunity terms. We have already

rejected this standing argument.  The JUA has the capacity to allege an unconstitutional taking of its property.

2. Elements of a Takings Violation

The Takings Clause of the Fifth Amendment provides that "private property [shall not] be taken for public use, without just compensation."  U.S. Const. amend. V.  Takings claims involve a two-step inquiry.  "To make a cognizable claim of a taking in violation of the Fifth Amendment, the plaintiffs must first show that they possess a recognized property interest which may be protected by the Fifth Amendment.  The plaintiffs must point to credible sources for their claimed property interest . . . 'such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'"  Wash. Legal Found. v. Mass. Bar Found., 993 F.2d 962, 973 (1st Cir. 1993) (quoting Bd. of Regents v. Roth, 408 U.S. 564, 577 (1972)); see also Parella v. Ret. Bd. of R.I. Employees' Ret. Sys., 173 F.3d 46, 58 (1st Cir. 1999) ("[P]laintiffs must first establish an independent property right before they can argue that the state has taken that right without just compensation.").

Assuming that the plaintiff can establish a constitutionally protected property interest, the plaintiff must next show that the challenged action "cause[d] an illegal taking of th[at] interest[]."  Wash. Legal Found., 993 F.2d at 974.  The Supreme Court has recognized two types of takings:  physical

takings and regulatory takings.  See Brown v. Legal Found. of Wash., 538 U.S. 216, 233 (2003).  As already noted, the JUA asserts a physical taking, and we therefore confine our analysis to that strand of takings law.[29]

"A physical taking occurs either when there is a condemnation or a physical appropriation of property."  Philip Morris, Inc. v. Reilly, 312 F.3d 24, 33 (1st Cir. 2002) (en banc). Physical takings challenges "involve[] the straightforward application of per se rules," which means that "[w]hen the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner."  Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency, 535 U.S. 302, 322 (2002); see also Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 537 (2005) ("The paradigmatic taking requiring just compensation is a direct government appropriation or physical invasion of private property."). "Temporary [physical] takings . . . are not different in kind from permanent takings, for which the Constitution clearly requires compensation."  First English Evangelical Lutheran Church v. County of L.A., 482 U.S. 304, 318 (1987) (quotation marks omitted).

---

[29] Regulatory takings challenges involve a multiple-factor test that was set forth in Penn Central Transportation Co. v. City of New York, 438 U.S. 104 (1978).  We note that Flores Galarza's brief incorrectly invokes regulatory takings principles in response to the JUA's physical takings argument.

For purposes of satisfying the first prong of the qualified immunity analysis, the JUA need not prove the taking of a constitutionally protected property interest; it need only allege such a taking. See Saucier, 533 U.S. at 201 (stating that the first prong of the qualified immunity analysis is satisfied where a constitutional right "would have been violated were the allegations established"); Mihos v. Swift, 358 F.3d 91, 98 (1st Cir. 2004) ("For a plaintiff to overcome a qualified immunity defense, he must show that his allegations, if true, establish a constitutional violation . . . ."). In accordance with our two-step approach to takings claims, the JUA must first allege a constitutionally protected property right to the funds in dispute. The JUA argues that, pursuant to Law 253 and the 2002 Amendment, "[t]he premiums collected and withheld by [Flores Galarza]," the "interest derived from the withheld premiums," and the Overstated Reserve Funds and Out-of-Pocket Funds – "are the private property of the [JUA]." Second, the JUA must allege a taking of that property. The JUA argues that Flores Galarza's appropriation of the funds in dispute is equivalent to a "permanent physical occupation and a per se taking for which just compensation must be paid."

Flores Galarza, on the other hand, argues that the JUA's takings claim fails both prongs of the takings analysis. According to Flores Galarza, "the JUA cannot establish that it has a

recognizable property interest" in any of the funds in dispute or that Flores Galarza's appropriation of these funds constitutes a taking.

Taking all facts in the light most favorable to the party asserting the injury, as we must at this threshold stage of the qualified immunity analysis, Saucier, 533 U.S. at 201, we find that the JUA alleges the taking of a constitutionally protected property interest in most, but not all, of the funds in dispute under Law 253 and the 2002 Amendment.

### 3. The Insurance Premiums

#### a. The Earned Premiums

The JUA argues that "the premiums collected and withheld by the [Secretary] are the private property of the [JUA]" under the plain language of Law 253. According to the JUA, although the premiums pass through Flores Galarza's hands before reaching the JUA, the premiums are never funds of the Commonwealth. To the contrary, the JUA argues, given that the JUA's responsibility for the compulsory insurance comes into effect at the time the premiums are paid to the Secretary of the Treasury, "the premium has to belong to the [JUA] at that time." Flores Galarza, the JUA argues, is thus merely a fiduciary who holds the premiums for the benefit of the JUA, as demonstrated by the 2002 Amendment's reference to the Secretary of the Treasury's "collection service performed in favor of the [JUA]." P.R. Laws Ann. tit. 26, § 8055(c). Flores

-54-

Galarza, on the other hand, contends that Law 253 "does not entitle JUA to ownership of the collected premiums until they are transferred to it by [Flores Galarza]." Therefore, Flores Galarza argues, because Law 253 does not state "when" the Secretary must transfer the insurance premiums to the JUA, his retention of the $173 million in premiums was not a withholding of private property – it was merely a "temporary retention or delay" in the transfer of funds which did not yet belong to the JUA.

In our view, Law 253 supports the JUA's claim of a property right to that portion of the insurance premiums not owed to privately insured motorists or their insurers ("Earned Premiums"[30]). Law 253 created the JUA for "[t]he main purpose of . . . provid[ing] the compulsory liability insurance to the applicants for said insurance that have been rejected by private insurers." Id. § 8055(b). As an insurer, the JUA is entitled to the Earned Premiums. Law 253 gives the JUA the power to hold property, and provides that the JUA "shall receive" premiums from the Secretary and that the Secretary "shall transfer" these premiums to the JUA. While the Secretary collects the insurance premiums and holds them for some unspecified amount of time before

---

[30] By "Earned Premiums," we mean the compulsory liability insurance premiums paid by vehicle owners who are obtaining the required coverage through the JUA rather than from a private insurer. We do not use this term in its strict definitional sense, that is, "[t]he portion of an insurance premium applicable to the coverage period that has already expired." Black's Law Dictionary (8th ed. 2004).

relinquishing them to the JUA, the Secretary is not an insurer – he is merely the custodian of these funds. As a custodian, the Secretary has no entitlement to the premiums, and his woefully undeveloped argument that the premiums do not vest in the JUA until the Secretary transfers them does not convince us otherwise. Cf. Webb's Fabulous Pharmacies, Inc. v. Beckwith, 449 U.S. 155, 162 (1980) ("[T]he State's having mandated the accrual of interest does not mean the State or its designate is entitled to assume ownership of the interest."). The JUA has successfully alleged an entitlement to the Earned Premiums under Law 253, and therefore a property interest in those funds. See id. at 161 (recognizing interest earned on private funds as property entitled to protection under Fifth Amendment); see also Brown, 538 U.S. at 235; Phillips v. Wash. Legal Found., 524 U.S. 156, 170-72 (1998).

We thus proceed to the second step of the takings analysis (i.e., whether the property was taken). The JUA argues that Flores Galarza's withholding of the Earned Premiums constituted a "permanent physical occupation and a per se taking for which just compensation must be paid." Specifically, the JUA contends that Flores Galarza physically took, albeit temporarily, $173 million of its insurance premiums, before transferring a large portion of those premiums to the JUA pursuant to the 2002 Settlement. The JUA's assertion of a property right in the Earned Premiums, together with its allegation of a physical appropriation

of those funds, is sufficient to allege the taking of a constitutionally protected property interest in those premiums under the first prong of the qualified immunity analysis. See Webb's, 449 U.S. at 164-65 (holding that taking of interest earned on private funds was a taking).

b. Reserve Fund: the Duplicate Premiums

While the JUA's alleged property right to the Earned Premiums is supported by Law 253, the same cannot be said for the JUA's alleged property right to the duplicate premiums paid by those already covered by privately obtained insurance policies ("Duplicate Premiums"). These premiums, Flores Galarza argues, "constitute a double payment for the same insurance," and, therefore, do not belong to the JUA, but rather belong to privately insured motorists or their insurers who are entitled to reimbursement. We agree.

Based on the law in effect at the time the premiums were withheld, the JUA was obliged to return the Duplicate Premiums to those requesting reimbursement. If no claim was made to these premiums after seven years, that money would lapse to the general fund of the Commonwealth Treasury. See P.R. Laws Ann. tit. 26, §§ 2603, 2606-2607. Thus, even if no one claimed the Duplicate Premiums within the requisite seven years, these funds became the property of the Commonwealth – not the JUA. Just as the Secretary is a custodian of the Earned Premiums for the benefit of the JUA,

-57-

the JUA is a custodian of the Duplicate Premiums for the benefit of either those entitled to reimbursement or, if the premiums go unclaimed, the Commonwealth.

The 2002 Amendment, which requires the JUA to transfer the Duplicate Premiums to the Secretary after just two years, explicitly recognizes the JUA's lack of a property right to the Duplicate Premiums. The "Statement of Motives" section of the 2002 Amendment states that

> during the existence of the Association, certain funds have been accumulated that do not belong to it . . . [which] results from the fact that a great number of [privately insured] consumers . . . pay the corresponding [compulsory liability insurance] premium . . . when they obtain the motor vehicle license for the first time or when they renew it, but they do not request the Association to reimburse the money as is their right.

(Emphasis added.)

Although claiming a right to all of the insurance premiums, the JUA concedes that a portion of the premiums collected by the Secretary (i.e., the Duplicate Premiums placed in the Reserve) "may belong to third parties: either motor vehicle owners with private insurance or private insurers who reimbursed their insureds." The JUA consequently admits that a large portion of the $73 million Reserve is the property of others. Given the lack of support for the JUA's claimed property right to the Duplicate Premiums, the JUA fails to allege a taking of this portion of the premiums under the first prong of the qualified immunity analysis.

-58-

c. Reserve Fund: the Overstated Funds

Our determination that the JUA has not alleged a property interest in the Duplicate Premiums does not extend to the remainder of the Reserve Fund – the "Overstated Reserve Funds" – which consists of the cushion set aside by the JUA to ensure that the Reserve was large enough to meet all of the requests for reimbursement by insurers who purchased private insurance. As noted earlier, the $73 million Reserve held back by the Commonwealth allegedly contained approximately $10 million in excess funds – money that, as it turned out, was not needed for reimbursement because fewer individuals than estimated had purchased their own policies, which meant, in turn, that less of the Reserve than anticipated constituted Duplicate Premiums.

According to the JUA, "since the [Overstated Reserve Funds] came from the [JUA] and do not, in fact, belong to others, they should have been accounted for as income for the [JUA]." Flores Galarza contends that since these funds are merely portions of the Reserve, which, in turn, "is merely an accounting tool" for allocating the Duplicate Premiums, "the JUA has no proprietary interest[] in the[se] moneys."

The "Statement of Motives" section of the 2002 Amendment, which was in place prior to Flores Galarza's appropriation of the Overstated Reserve Funds in November 2002, explicitly provides that the $73 million Reserve consists of funds "that <u>do not belong to it</u>

[the JUA]" as the result of the double payment of insurance premiums by some drivers. The 2002 Amendment therefore requires the JUA to immediately transfer to the Secretary "the funds known in its annual statement as 'Funds Retained by the Insurer Belonging to Others'" – that is, the $73 million Reserve – and to continue doing so every two years. There is, however, no carve-out for the "cushion" portion of the Reserve that consists of Overstated Funds. In fact, the 2002 Amendment provides that the Reserve funds transferred to the Secretary necessarily include any "reserve excess," and that this reserve excess "may be used as resources in the General Fund." P.R. Laws Ann. tit. 26, § 8055(l).

The JUA argues, in essence, that to the extent the Amendment directs the transfer of the Overstated Reserve Funds to the Commonwealth, the provision effects a taking of the JUA's property. Under Law 253, the JUA is obliged to insure drivers who might otherwise be uninsurable; the premiums for that insurance are initially collected by the Secretary. The JUA argues that all of those collected funds, other than the Duplicate Premiums, constitute the "Earned Premiums" and thus belong to it. Indeed, the Insurance Commissioner's adjustment of the Reserve percentage in 2001 to more accurately reflect the percentage of traditionally insured vehicle owners indicates the Commonwealth's recognition that the JUA is entitled to any funds above the amount representing Duplicate Premiums. Notably, the Amendment identifies the funds to

be transferred to the Commonwealth every two years as funds "Belonging to Others." Presumably, any such funds that do not belong to others belong to the JUA. We therefore conclude that the JUA has alleged the taking of a constitutionally protected property interest in the Overstated Reserve Funds.

4. The Out-of-Pocket Funds

When Flores Galarza stopped transferring insurance premiums to the JUA in 2000 in order to meet the cash-flow needs of the Commonwealth, the JUA had to reimburse privately insured drivers and their insurers out of its own pocket. While the JUA presumably recouped some of its costs pursuant to the 2002 Settlement, the JUA alleges that there was still $13.6 million outstanding – an amount which the JUA argues should have been set off against the $73 million retained by Flores Galarza. The JUA alleges that the $13.6 million in Out-of-Pocket Funds "used to reimburse insurance premiums from January to September 2002 [is] the private property of the [JUA]."

The parties do not dispute that the Out-of-Pocket funds used by the JUA to reimburse third parties belonged to the JUA. Accordingly, the JUA alleges a property right in the Out-of-Pocket Funds. Turning to the second step of the takings analysis, the JUA alleges that Flores Galarza physically appropriated $13.6 million in Out-of-Pocket Funds from the JUA by retaining the full $73 million in Reserve funds. At this stage of the qualified immunity

analysis, the JUA's assertion of a property right to the Out-of-Pocket Funds, together with its allegation of a physical invasion of those funds, is sufficient to allege the taking of a constitutionally protected property interest in those funds.

5. The Interest

Our determination that the JUA alleges a property right to the Earned Premiums, the Overstated Reserve Funds and the Out-of-Pocket Funds compels a similar conclusion with respect to the interest lost as a result of the withholding of those monies. In Phillips, the Supreme Court held that interest income generated by client funds in IOLTA accounts was the private property of the client under the common law rule that "interest follows principal." 524 U.S. at 165-72; see also Webb's, 449 U.S. at 162 ("The usual and general rule is that any interest . . . follows the principal and is to be allocated to those who are ultimately to be the owners of that principal."). The fact that the Secretary is authorized to hold the Earned Premiums for some time before turning them over to the JUA is of no consequence. See Webb's, 449 U.S. at 162 ("That lack of immediate right . . . does not automatically bar a claimant ultimately determined to be entitled to all or a share of the fund from claiming a proper share of the interest, the fruit of the fund's use, that is realized in the interim."). By alleging a property right in the Earned Premiums, the Overstated Reserve Funds

and the Out-of-Pocket Funds, the JUA also has alleged a property right in the resulting lost interest.[31]

Turning to the second step of the takings analysis with respect to interest, the JUA alleges that by temporarily withholding the Earned Premiums, Flores Galarza physically took $14.2 million in interest generated by them. See Parella, 173 F.3d at 59 n.10 (stating that in order to demonstrate a taking of interest, "plaintiffs have the burden of proving that they had a constitutional right both to the principal (i.e., withheld benefits) and to the interest on that principal"). The JUA's assertion of a property right in the interest generated by the Earned Premiums, together with its allegation of a physical taking of that interest, is sufficient to allege the unconstitutional taking of that interest under the first prong of the qualified immunity analysis. See Brown, 538 U.S. at 235; Webb's, 449 U.S. at 164-65.[32]

---

[31] It follows, of course, that the JUA does not possess a property right to the interest lost as a result of the withholding of the Duplicate Premiums, which we have held do not belong to the JUA. See Parella v. Ret. Bd. of R.I. Employees' Ret. Sys., 173 F.3d 46, 62 (1st Cir. 1999) (holding that defendant's refusal to pay interest on withheld benefits was not a taking because plaintiffs did not demonstrate property right to benefits).

[32] The allegation that Flores Galarza took the interest on the full amount of the $173 million in Earned Premiums that was withheld covers at least a portion of the interest generated by the Overstated Reserve Funds and the Out-of-Pocket Funds, which were part of that $173 million total. It appears that the $14.2 million in claimed interest also includes the interest on the Overstated Reserve and Out-of-Pocket Funds that were retained after the

        6. Summary of Analysis of the First Prong of the
        Qualified Immunity Doctrine

The JUA has successfully alleged that Flores Galarza committed a constitutional violation by taking its Earned Premiums, Overstated Reserve Funds, Out-of-Pocket Funds, and the interest generated thereon. The JUA has failed to allege a taking of the Duplicate Premiums or the interest generated thereon. Therefore, as we turn to the second prong of the qualified immunity analysis (i.e., whether the impermissibility of the taking was clearly established at the time of the violation), we exclude from our analysis the Duplicate Premiums and the related interest.

## B. Second Prong: Constitutional Right was "Clearly Established" at Time of Violation

"The second question [of the qualified immunity analysis] deals with fair warning; it asks whether the law was clearly established at the time of the constitutional violation." Savard v. Rhode Island, 338 F.3d 23, 27 (1st Cir. 2003) (en banc). This requirement ensures that "officers are on notice that their conduct is unlawful" before subjecting them to suit. Saucier, 533 U.S. at 206. One way of determining whether a constitutional right was clearly established at the time of the alleged violation "is to ask whether existing case law gave the defendants fair warning that their conduct violated the plaintiff's constitutional rights."

Settlement. Such interest also is embraced within our conclusion that the JUA adequately alleged an unconstitutional taking of the interest.

-64-

<u>Suboh</u> v. <u>Dist. Attorney's Office of Suffolk</u>, 298 F.3d 81, 93 (1st Cir. 2002).  In conducting this inquiry, "[t]he court must canvass controlling authority in its own jurisdiction and, if none exists, attempt to fathom whether there is a consensus of persuasive authority elsewhere."  <u>Savard</u>, 338 F.3d at 28.

Significantly, "[t]his inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'"  <u>Wilson</u>, 421 F.3d at 56 (quoting <u>Saucier</u>, 533 U.S. at 201).  As we have noted, "[c]ourts must be careful not to permit an artful pleader to convert the doctrine of qualified immunity into a hollow safeguard simply by alleging a violation of an exceedingly nebulous right."[33]  <u>Limone</u> v. <u>Condon</u>, 372 F.3d 39, 46 (1st Cir. 2004).

On the other hand, "[t]his exploration is not limited to cases directly on point . . . .  '[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances' . . . ."  <u>Savard</u>, 338 F.3d at 28 (quoting <u>Hope</u> v. <u>Pelzer</u>, 536 U.S. 730, 741 (2002)).  In striking this balance, we have noted that

> the relevant legal rights and obligations must be particularized enough that a reasonable official can be expected to extrapolate from them and conclude that a certain course of conduct will violate the law.

---

[33] We note that, given the required specificity, "the bases for the[] determinations [under the second and third prongs of the qualified immunity analysis] often overlap."  <u>Savard</u>, 338 F.3d at 27.

> Consequently, if the operative legal principles are clearly established only at a level of generality so high that officials cannot fairly anticipate the legal consequences of specific actions, then the requisite notice is lacking. The bottom line is that the qualified immunity defense prevails unless the unlawfulness of the challenged conduct is "apparent."

Savard, 338 F.3d at 28 (citation omitted) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

The JUA argues that "[t]he contours of the Takings Clause . . . are very straightforward in the case where the government takes property from an individual for public use," as alleged here. Relying upon cases which hold that uncompensated physical appropriations of private property – including interest – are unconstitutional under the Fifth Amendment, the JUA contends that its "right to be justly compensated for the taking of its property" was "clearly established" at the time of the challenged conduct.

Not surprisingly, Flores Galarza disagrees. While "it [i]s clearly established that the taking of a property interest without just compensation [i]s unconstitutional," he argues that this proposition is too broad to satisfy the second prong of the qualified immunity analysis. "The property rights claimed by the JUA," Flores Galarza contends, "cannot be easily read into the law enabling the JUA and the Compulsory Liability Insurance," and, therefore, are not clearly established. We now test that proposition.

1.  The Earned Premiums and Interest[34]

We already have concluded that the JUA, under Law 253, alleges a property interest in the Earned Premiums and the interest generated by those premiums.  Because Law 253 was on the books at the time Flores Galarza withheld the Earned Premiums and interest, we conclude that the JUA's alleged property interest in those funds was clearly established.  Flores Galarza essentially acknowledged as much (at least with respect to the Earned Premiums) by returning the Earned Premiums to the JUA pursuant to the 2002 Settlement.

The law was not so clear, however, that Flores Galarza's alleged withholding of the Earned Premiums and interest was a taking.  Law 253 does not establish when the Secretary must transfer the premiums to the JUA.  As noted by Flores Galarza,

> [t]he compulsory insurance law is completely devoid of a timetable that controls the transfer of the premiums collected by the Secretary of the Treasury to the JUA.  The statute simply states that the transfers must be made.  However, _when_ these transfers must be made is an entirely different question.  The JUA has never pointed to any substantive

---

[34] The JUA does not explicitly allege a separate property right in the interest on the Overstated Reserve and Out-of-Pocket Funds, presumably because such an allegation is largely subsumed within its interest allegation concerning the Earned Premiums.  See supra note 32.  We therefore address interest in this section and the next only in the context of the Earned Premiums.  To the extent interest on the Overstated Reserve and Out-of-Pocket Funds is not covered by that discussion – i.e., for interest accruing on those funds after the Settlement amount was transferred to the JUA – our discussion of the principal amounts suffices to dispose of the interest.

> source that establishes its entitlement to a
> prompt transfer of the premiums.

(Citation omitted.) Under the second prong of the qualified immunity analysis, it is not enough for the JUA to argue that Flores Galarza physically took the Earned Premiums to which the JUA was entitled under Law 253. Here, the JUA must demonstrate that Law 253 entitled the JUA to the Earned Premiums within a specified amount of time, such that the unlawfulness of Flores Galarza's temporary withholding of the premiums was "apparent." This it cannot do. Indeed, even if we imported into Law 253 a requirement that the Secretary transfer the premiums to the JUA within a reasonable period of time, that reasonableness requirement would be too indefinite to allow us to conclude that the alleged taking was clearly established. The unlawfulness of Flores Galarza's temporary withholding of the Earned Premiums, therefore, was not "apparent" under the statute. The right to interest inescapably is tied to the JUA's entitlement to the premiums and therefore also was not clearly established.

## 2. The Overstated Reserve Funds

The lack of clarity is even more apparent with respect to the Overstated Reserve Funds, which was the portion of the Reserve in excess of the amount necessary to reimburse insureds or insurers who already had paid for coverage. Certainly after enactment of the 2002 Amendment to the compulsory insurance law, which specifically required the JUA to transfer to the Secretary all

-68-

funds held in the Reserve as of December 31, 2001, the law did not clearly establish that the JUA had a property right in the $10 million of Overstated Reserve Funds or, indeed, that withholding any of the designated Reserve of $73 million was an unconstitutional taking. Whether, and how much, of that $10 million is in fact "excess" remains a matter of debate.

Although the Secretary began withholding the Overstated Reserve Funds in 2000, along with the Earned and Duplicate Premiums, the alleged $10 million excess was undifferentiated from the balance of the Earned Premiums. As noted earlier, the JUA essentially claims that the $10 million should be considered Earned Premiums in which it holds a property right, and as such that money is encompassed within our prior discussion. Therefore, the law was not clearly established either before or after the 2002 Amendment that the Secretary's retention of the Overstated Reserve Funds was an unconstitutional taking.

3. The Out-of-Pocket Funds

The JUA argues that it has a clearly established right to the $13.6 million in Out-of-Pocket Funds, which Flores Galarza allegedly should have deducted from the $73 million Reserve he took on behalf of the Commonwealth. Since it is undisputed that the Out-of-Pocket funds belong to the JUA, the JUA's alleged property right in the Out-of-Pocket Funds is clearly established. It also was clearly established that the physical taking of property,

-69-

without compensation, violated the Constitution. See Tahoe-Sierra, 535 U.S. at 322-23 (noting that the Supreme Court's "jurisprudence involving condemnations and physical takings is as old as the Republic"). We therefore conclude that Flores Galarza's alleged physical taking of the Out-of-Pocket Funds alleged a violation of clearly established law.[35]

> ### 4. Summary of Analysis of the Second Prong of the Qualified Immunity Doctrine

The JUA has successfully alleged that Flores Galarza's taking of the Out-of-Pocket Funds violated clearly established constitutional law. The JUA has failed to allege a clearly established violation of law with respect to the Earned Premiums, the interest generated by those premiums, or the Overstated Reserve Funds. Therefore, as we turn to the third prong of the qualified immunity analysis (whether a reasonable officer would have believed that the alleged conduct violated clearly established law), we focus only on the alleged taking of the Out-of-Pocket Funds.

## C. Third Prong: Reasonable Official Would Believe that Action Violated Clearly Established Right

---

[35] While we note that the law was "clearly established," we take no position on whether Flores Galarza's alleged appropriation of the Out-of-Pocket Funds was, in fact, a taking without compensation. "The inquiry into qualified immunity is separate and distinct from the inquiry into the merits." Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

"The final prong of the qualified immunity analysis, often the most difficult one for the plaintiff to prevail upon, is 'whether an objectively reasonable official would have believed that the action taken violated that clearly established constitutional right.'" Wilson, 421 F.3d at 57-58 (quoting Starlight Sugar, Inc. v. Soto, 253 F.3d 137, 141 (1st Cir. 2001)). The qualified immunity inquiry recognizes that "[i]t is not always evident at the time an official takes an action that a clearly established right is involved. For example, the factual situation might be ambiguous or the application of the legal standard to the precise facts at issue might be difficult." Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 61 (1st Cir. 2004). So long as an "officer's mistake as to what the law requires is reasonable," Saucier, 533 U.S. at 205, the officer will be entitled to qualified immunity.

The JUA argues that "[t]he fact that the [JUA's] property was taken without any compensation whatsoever – and actually, to a very large cost to the [JUA] – would have alerted any reasonable official that he was violating [the JUA's] rights under the Takings Clause." We disagree.

After the Secretary discontinued the transfer of premiums in 2000, the JUA was forced to pay out a total of $13.6 million of its own funds to third parties seeking reimbursement. The 2002 Amendment was subsequently enacted, which required the JUA to pay

to the Secretary $73 million in Reserve funds.  One month later, pursuant to the 2002 Settlement, Flores Galarza made a "massive transfer of all the funds [he] had retained since [he] stopped making the transfers," but he held back the $73 million in Reserve funds that the JUA was required to pay the Secretary under the 2002 Amendment.  As Flores Galarza argues, a reasonable officer in these circumstances would have believed that he "had a law mandate, stemming from the [2002 Amendment], to retain for use by the Department of Treasury the Reserve Fund recognized by JUA as of December 31, 2001.  Any officer in his shoes would have acted as he did in immediately retaining the full Reserve Fund amount without any compensation" to the JUA.  Nothing in the 2002 Amendment suggests that funds owed to the JUA had to be deducted from the $73 million Reserve, and that the failure to do so would constitute a taking.  As Flores Galarza argues, "money [is] fungible in nature." Thus, a reasonable officer could have believed that the 2002 Amendment required "the JUA [] to replenish the Reserve Fund" and then debit the Out-of-Pocket Funds "from this 'new' Reserve Fund . . . and not from the [$73 million] Reserve allocation recognized as of December 31, 2001."  In that way, the JUA would be made whole with respect to the Out-of-Pocket Funds.  Because a reasonable officer would not have believed that retaining $13.6 million in Out-of-Pocket Funds violated the JUA's clearly established rights,

we conclude that Flores Galarza is entitled to qualified immunity on this claim.

## VI.

We summarize the essential points of our analysis. The JUA has standing to sue Flores Galarza under 42 U.S.C. § 1983, and the Supreme Court's prudential ripeness requirements for takings claims pose no barrier to our consideration of the case. We may not, however, address res judicata issues in this interlocutory appeal. Flores Galarza is amenable to suit in his official capacity under the Eleventh Amendment because the JUA seeks prospective declaratory and injunctive relief against him in that capacity, namely: a declaration that his taking of insurance premiums, interest, and other funds to alleviate the cash-flow problems of the Commonwealth violates the Constitution; and an injunction enjoining him from withholding insurance premiums and from enforcing the terms of the 2002 Amendment to the extent they amount to an unconstitutional taking. Notwithstanding the indistinct line between official- and personal-capacity suits against government officials, we conclude that the JUA seeks to hold Flores Galarza liable in his personal capacity for damages. We conclude, however, that he is immune from such liability. Specifically, because the law was not clearly established that Flores Galarza effected an unconstitutional taking of the withheld insurance premiums, the interest generated by those premiums, or

the Overstated Reserve Funds, he is entitled to qualified immunity on these claims.  Additionally, because a reasonable officer would not have believed that the failure to reimburse the JUA for the Out-of-Pocket Funds violated the JUA's rights, qualified immunity forecloses a damages remedy against him on that claim as well.

In conclusion, we **affirm** the district court's decision that the JUA has standing to sue Flores Galarza, and that Flores Galarza is amenable to suit in his official capacity under the Eleventh Amendment.  We **reverse** the district court's decision that Flores Galarza is not entitled to qualified immunity from suit in his personal capacity.  Each party shall bear its own costs of appeal.

**So ordered**.

**- Concurring Opinion Follows -**

**HOWARD, Circuit Judge, concurring in the judgment.** One part of this appeal concerns a takings claim under the Fifth and Fourteenth Amendments of the federal Constitution against Juan Flores Galarza, a state official acting in his individual capacity, for withholding millions of dollars from the JUA, a state-created pool of insurers. The lead opinion concludes that a viable takings claim may exist against state officials acting in their individual capacities, but that Flores Galarza is entitled to qualified immunity because his withholding funds was reasonable in light of the unique circumstances present. Ante at 67-69. I am not entirely convinced that federal takings claims may ever properly lie against state officials acting in their individual capacities. Cf. Monell v. N.Y City Dep't of Social Servs., 436 U.S. 658, 687 (1978) ("It beggars reason to suppose that Congress would have exempted municipalities from suit [in enacting 42 U.S.C. § 1983], insisting instead that compensation for a taking come from an officer in his individual capacity rather than from the government unit that had the benefit of the property taken."); Langdon v. J.J. Swain, 29 Fed. Appx. 171, 172 (4th Cir. 2002) ("[T]akings actions sound in tort against governmental entities rather than individual state employees in their individual capacities."). But we should not be resolving this difficult question here because the JUA's individual capacity claim against Flores Galarza is not ripe under

<u>Williamson County Regional Planning Commission</u> v. <u>Hamilton Bank of Johnson City</u>, 473 U.S. 172, 195 (1985).

In <u>Williamson County</u>, the Supreme Court held that a federal takings claim is not ripe until the claimant has met two preconditions. <u>See</u> 473 U.S. at 186, 194-95. First, in regulatory takings cases, the claimant must show that the government entity charged with enforcing the regulation at issue has rendered a final decision on the regulation's meaning ("the finality requirement"). <u>See</u> <u>id.</u> at 186; <u>Pascoag Reservoir & Dam, LLC</u> v. <u>Rhode Island</u>, 337 F.3d 87, 91 (1st Cir. 2003) (stating that the finality requirement does not apply in physical takings cases). Second, in regulatory and physical takings cases, the claimant must pursue compensation for the alleged taking through state processes, so long as the state provides a "reasonable, certain and adequate provision for obtaining compensation" ("the litigation requirement"). <u>Williamson County</u>, 473 U.S. at 194-95; <u>Pascoag</u>, 337 F.3d at 92. The litigation requirement follows from the principle that no federal takings violation occurs until "just compensation" has been denied by the state. <u>See</u> <u>Suitum</u> v. <u>Tahoe Reg'l Planning Agency</u>, 520 U.S. 725, 733 (1997).

My disagreement with the lead opinion's treatment of the ripeness issue concerns its application of the litigation

requirement.[36] According to the lead opinion, claimants must avail themselves only of state process to recover compensation if the state has adopted a process "particularly aimed at providing compensation when government action effects a taking" and that "such [process does] not include litigation of a state takings claim [under the state constitution] or any general remedial cause of action under state law." Ante at 26 & 28. Based on this reasoning, the JUA's claim against Flores Galarza is deemed ripe because Puerto Rico does not offer a specific administrative process or cause of action to seek "compensation in the unusual circumstance of an alleged unconstitutional taking arising from the government's appropriation of funds." Id. at 29.

There is no support in Supreme Court precedent for the conclusion that claimants are relieved of the litigation requirement unless the state has adopted specific processes (presumably by way of statute) through which such compensation may be recovered. Indeed, Williamson County suggests just the opposite. The Williamson County Court derived the litigation rule from procedural due process cases holding that a plaintiff does not have a due process claim "unless or until the state fails to provide an adequate remedy for the property loss." Id. at 195 (citing Hudson v. Palmer, 468 U.S. 517, 532 n.12 (1984)). In the

---

[36] The finality requirement does not apply because the JUA seeks compensation for a physical, rather than a regulatory, taking. Pascoag, 337 F.3d at 91.

-77-

due process context, the Court has held that common-law remedies available in state-court actions are adequate.  <u>Hudson</u>, 468 U.S. 534-35.  Yet the causes of action recognized as adequate in <u>Hudson</u> are exactly the sort of "general remedial causes of action under state law" that the lead opinion deems insufficient here.  <u>Ante</u> at 26.

Several other federal courts have rejected my colleagues' limitation on the litigation requirement.  The Second Circuit has held that a federal takings claim was not ripe under <u>Williamson County</u> because the claimant had not brought a state-court action seeking recovery under the takings clause of the Connecticut Constitution.  <u>Villager Pond, Inc.</u> v. <u>Town of Darien</u>, 56 F.3d 375, 379-80 (2d Cir. 1995);  <u>see</u> <u>also</u> <u>Southview Assocs.</u> v. <u>Bongartz</u>, 980 F.2d 84, 100 (2d Cir. 1992) (concluding that takings case was not ripe because plaintiff did not bring claim under Vermont Constitution's takings clause seeking compensation).[37]  Similarly, the Ninth Circuit ordered dismissal of a federal takings claim as not ripe where the claimant did not bring an action for recovery under the Hawaii Constitution's takings clause.  <u>Austin</u> v. <u>City & County of Honolulu</u>, 840 F.2d 678, 681 (9th Cir. 1988).  And the Fifth Circuit rejected a takings claim on ripeness grounds where

---

[37] Indeed, in <u>Southview</u>, 980 F.2d at 100, the court explicitly rejected the argument that <u>Williamson County</u>'s litigation requirement mandated the claimant to pursue state processes only if the state provided a specific statutory avenue of relief.

the claimant could have, but did not, bring a state-court nuisance action to obtain compensation.  See Samaad v. City of Dallas, 940 F.2d 925, 935 (5th Cir. 1991); accord Wiltzius v. Town of New Milford, 453 F. Supp. 2d 421, 431 (D. Conn. 2006) (takings claim not ripe because claimant did not bring state court action under state constitution to seek compensation); Franco v. Dist. of Columbia, 456 F. Supp. 2d 35, 42 (D.D.C. 2006) (takings claim not ripe where claimant failed to bring contract action in state court to obtain compensation); Bender v. City of Clearwater, 2006 WL 1046944, at *23 (M.D. Fla. Apr. 19, 2006) ("Plaintiff must look to state remedies for compensation for the alleged taking, whether that remedy is titled 'an inverse condemnation' claim or something else, such as a suit for damages or trespass, before he can pursue his takings claim in federal court.").  These cases amply demonstrate that adequate state process under the litigation requirement encompasses more than just those state processes "particularly aimed at providing compensation" for a government taking.[38]  Ante at 26.

---

[38] I understand that the lead opinion seeks to limit the litigation requirement because of its concern that preclusion principles will prevent takings claims from being litigated in federal court, if claimants must pursue state remedies in state court.  See ante at 28.  This was the view of four Justices of the Supreme Court in San Remo Hotel v. City & County of San Francisco, 545 U.S. 323, 349 (Rehnquist C.J., concurring) who proposed revisiting the litigation requirement.  The majority, however, disagreed, concluding that "it is hardly a radical notion to recognize that . . . a significant number of plaintiffs will necessarily litigate their federal takings claims in state courts." Id. at 347.  As the Court has

-79-

In light of this understanding of the litigation requirement, the remaining question is whether Puerto Rico provides "an adequate procedure" for the JUA to seek compensation. The burden of proving that no adequate state process is available rests with the JUA. See Liberty Mut. Ins. Co. v. La. Dep't of Ins., 62 F.3d 115, 117 (5th Cir. 1995). It is not enough to show only that the adequacy of state process remains unsure and undeveloped; it must be shown to be unavailable. See Culebras Enters. Corp. v. Rivera Rios, 813 F.2d 506, 513-15 (1st Cir. 1987) (holding that taking claimant was required to seek compensation from the Puerto Rico courts even though the Puerto Rico Supreme Court had never awarded damages in an inverse condemnation action); accord, e.g.,

---

rejected this concern as a basis for revisiting the litigation requirement, it does not serve as an adequate basis for substantially limiting it in this circuit.

The lead opinion also supports its limiting construction of the litigation requirement by suggesting that requiring claimants to pursue state constitutional takings claims or other general causes of action would require claimants to exhaust state remedies, which is inconsistent with Supreme Court caselaw interpreting 42 U.S.C. § 1983. E.g., Pasty v. Fla. Bd. of Regents, 457 U.S. 496 (1982) The Williamson County Court accepted this argument for purposes of the finality requirement, by holding that a claimant need not exhaust judicial review after a state agency has definitively interpreted a regulation. 473 U.S. at 192-93. But the Court did not endorse a similar limiting principle for the litigation requirement. Moreover, Washlefske v. Winston, 234 F.3d 179, 183 (9th Cir. 2000), relied on by the lead opinion for its exhaustion analysis, states that exhaustion is not required to meet the finality requirement; it says nothing about the scope of the litigation requirement.

Villager Pond, 56 F.3d at 380; S. Pac. Transp. Co. v. City of Los Angeles, 922 F.2d 498, 505 n.8 (9th Cir. 1990).

Puerto Rico's Constitution includes a takings provision, See P.R. Const. Art. II, § 9, and Flores Galarza suggests that the JUA could seek compensation through a mandamus action. It is not entirely clear that the JUA could obtain the compensation that it seeks through either an action under the Commonwealth's Constitution or some other cause of action. But it has not been shown that such relief is unavailable either. In these circumstances, the JUA was required to pursue its state-law remedies before turning to the federal Constitution for relief. E.g., Southview Assocs., 980 F.2d at 100. Because the JUA did not pursue compensation through the state system, its federal claim against Flores Galarza, in his individual capacity, should have been dismissed on ripeness grounds.[39]

---

[39] I agree that, to the extent the JUA is pursuing facial challenges to Puerto Rico statutes, the litigation requirement is not implicated. San Remo, 545 U.S. 345-46.